Criminal prosecution upon bill of indictment containing three counts charging in summary that defendant (1) unlawfully, willfully, and feloniously did break and enter building occupied by Pinehurst Greenhouses with intent to steal, take and carry away its property; (2) feloniously did steal, take and carry away one large metal safe, $100 in money, government bonds and other securities of value more than $50, property of Pinehurst Greenhouses; and (3) feloniously did receive and have said safe, money, bonds and other property of Pinehurst Greenhouses knowing that same had been feloniously stolen, taken and carried away, all contrary to the form of the statute, etc.
Upon the trial in Superior Court the State offered evidence in chief tending to show these facts and circumstances: On 16 November, 1947, at 5:30 o'clock p.m., the doors to the office building of the Pinehurst Greenhouse were locked. The window, an "up and down window," which had just been put in the end of an addition to the building, was closed but not locked. On that date there was in this building a steel safe, about three feet high by two and a half feet wide. It would take two men to roll it. Two men could pick it up. The safe contained at the time the Greenhouse money taken in the day before, approximately $170 in change and bills and a few checks, in addition to bonds of the manager of the Greenhouse and other articles of personalty belonging to others. The next morning, when the manager and others arrived at the building, the safe was gone, the window at the back was closed just as it was the evening before and the door was locked from the outside. The sheriff was called. The safe was found about a mile and a quarter away in the woods. The door of it was bursted and off; parts of it laying around on the ground; and it was face down. None of the property was found. The sheriff and police officers found that there were tracks of a man and of a woman at the window of the Greenhouse; and they also found where the safe had been rolled out of the office to the front door and apparently loaded onto a car or truck backed up to the front, and hauled away.
The tracks of the vehicle indicated that the treads of three of the tires, one rear and two front, were of same make and alike, and that of the right rear tire was different. The left front tire was slick, — practically worn down to the fiber in a couple of places. The right front and left rear tires were good.
The officers picked up the tracks in front of the building and followed them along a circuitous route down a kind of sandy road, through a field, *Page 583 
out an old road, and into the woods. There in the woods and rough, it appeared that the vehicle "got stuck up," but the tracks went on 75 or 100 yards further down in the wood to the point where the safe was found. The officers observed and followed tracks of the vehicle leading from the place where the safe was found along a specific route through woods, grass, fire lane and mud into the hard surface and on into the yard of the Fuller Currie home. Along the route the vehicle apparently "got stuck up" three times. First, in a clay pit; second, where a woman's track and a man's track, — apparently made in trying to push the car out, — were seen; and third, where there was a man's track, also apparently made in trying to push the car out. At this last place there was very deep sand that had been plowed up recently, and the man's tracks, several of them were very plain. Also at this point the sheriff saw and picked up a paper sales slip, lying on the ground. (See more about this slip later.) After entering the yard of the Fuller Currie home, the tracks were around the house and out to the gun club and back into the yard again.
The officers then went to A. J. Frye's (defendant's father's home), where they saw the same tracks, and after talking with Mrs. Currie over there, they followed these tracks back to Hickory Inn, to Herbert Worthey's, and from there back on the hard surface street. They hit the same track again below the race track, which leads from the Southern Pines road back to Fred Arnett's.
The officers then went to Hamlet, arriving there about 5 o'clock in the afternoon, and found defendant at his father-in-law's house. Defendant's car, a Plymouth coupe, was in the back yard. The officers testified that the tires on that car at the time made a track like the track described leading from the Greenhouse to where the safe was found, and that the opening in the back part of the coupe was large enough for the safe to be put in it. The officers thereupon arrested defendant. And the chief of police testified that defendant said that on Sunday night he had been to his father's and Hickory Inn and Fred Arnett's and Jackson Hamlet's, — and that he spent the night at Fuller Currie's home, — where he went in and to bed around 1 o'clock; that he did not leave there at any time during the night; that he had been to all the places the officer mentioned in following the tracks — driving his car, a Plymouth coupe, but did not state that he went to the place where the safe was; that he was at his father's and left there around 10 o'clock, and went to Hickory Inn, and to Jackson Hamlet's, hunting in vain for whiskey; and that he left the Currie home next morning about 7 o'clock in his car, driving back to Hamlet.
The chief of police testified that the right-foot shoe of defendant fitted perfectly the man's tracks, several of them, where the car was last stuck; *Page 584 
that the heel of the shoe had two rings around it; and this track in the sand had two rings around the heel of it.
The sheriff testified as to the sales slip found at the third place where the tracks of the vehicle indicated it had been stalled, and where a man's tracks were seen, and without objection by defendant, that he went to this store in Hamlet and asked the saleslady, whose name is on the slip, if she sold these particular articles and that she said she sold them to Hobart Frye; that he later showed the slip to Hobart Frye and he said he bought those articles; and that later he talked to Hobart Frye's wife and she said Hobart Frye gave her that merchandise.
And the chief of police also testified that Polly Currie was at the Fuller Currie home the next morning; "that a bunch is in and out of there all the time"; and that "that is the house of the late Fuller Currie and members of the family include Floyd, Dave and Peggie."
The State also offered evidence tending to show (1) that clay was on the car in front, and that it looked like the clay at the clay hole where the vehicle apparently stalled; that bushes, leaves, pine straw or needles and a piece of stump were "up under the car," — pine needles in the car — some on the floor boards; (2) that there were in the back of the car "a number" of particles of black paint that looked like the paint on the safe; (3) that an axe was found on the wood-pile at the Fuller Currie home, and on it were two substances, one of which looked to be paint, and the other to be brass or copper, — similar in color with the dial or portion of safe broken; (4) that the particles of paint found in the back of the car, together with paint taken from the safe, as well as the axe and the dial of the safe, were submitted to the Federal Bureau of Investigation for comparison.
In this connection, a special agent of the FBI, testifying as an expert, stated (1) that he made spectographic comparison of the material taken from the compartment and trailer hitch, and of the black material taken from the axe, and the known paint from the safe, and in each instance the paint was "identical in comparison and could have come from the same source"; and (2) that he made a like comparison of the dial and handle from the safe, and the other material found on the axe, and found this material of which the knob is composed to be similar to the composition of the substance on the head of the axe and "they could have come from the same source," — that so far as he could tell they were identical in color and substance; and that the safe paint was identical in composition; but the safe paint is different from the car paint.
And the State's evidence in chief also tended to show that defendant denied continuously all the way through that he had anything to do with the alleged robbery. *Page 585 
The State, having first rested its case, and the court having overruled defendant's motion then made for judgment as of nonsuit, to which defendant excepted, defendant offered evidence.
Defendant, as witness for himself, testified on direct examination: That he was born and raised in Moore County but had been living in Richmond County twelve years; that on 16 November he came to see his father who was very ill; that he came Saturday afternoon, the 15th, and stayed until Monday morning when he went back home; that he stayed at his father's house until about 11:30; that because his brother Roger from Washington, and his sister and others were there, and there wasn't room at his father's, he went over to the Fuller Currie house to spend the night; that he left his car in front of the house; that he went to sleep around one o'clock, and didn't see the car any more until a quarter to seven the next morning; that the car was in good running condition when he left it there that night, but next morning he could get it only in low gear; that he went to his brother's filling station and got it fixed; that the car got hot before he reached Pinehurst, and, on examination, he found a hole had been knocked in the radiator.
Defendant further testified that he did not lend his car for any such purpose; that Pauline Currie had a brother Davis Currie staying at the Currie house; that he saw an axe at the wood-pile but denied having anything to do with the breaking and entering the Greenhouse, or taking or breaking into the safe, or that he gave permission to anyone to use his car that night.
And, under cross-examination, defendant testified that he spent the second night over there at the Currie home; that he took Polly Currie and Davis Currie when he went for whiskey immediately after he got to the house, around a quarter to twelve; that he parked his car and did not take the keys out of it, and they were in there the next morning; and after returning to the house he, defendant, took two drinks, about 1 o'clock, and sat on the bed in the front room possibly 10 or 15 minutes — Davis sitting there with him — and he fell asleep talking; that he did not take his clothes off at all that night; that he just untied his shoes; that he didn't know anything else until 7 o'clock the next morning, and he had his shoes and clothes on then; and that he was lying across the bed; that the next morning his car was in the back yard; and that as he pulled out of the driveway he discovered that his car was not in the condition it was when he left it — it wouldn't go into second gear.
He further testified that he purchased the items listed on the sales slip on 15 November, but that he did not know, and could not explain how that slip got out in the woods where the officers found it. He further testified that on Sunday night, the 16th, he saw the night watchman in Pinehurst, whom he knew, and talked to him one time around 20 or 5 *Page 586 
minutes to 12 o'clock; that at that time Polly Currie and Davis were with him; that Davis was in the back seat, lying down, and Polly in the front seat on the right-hand side; and that he did not know where Polly and Dave were on the day he was testifying.
Roger Frye, as witness for defendant, testified in pertinent part: "I am brother of Hobart Frye, and I am Court Reporter for the U.S. District Court in Washington . . . I was at home on the 16th of November, because my father was about to die. I saw my brother Hobart at my father's a little after 11 o'clock. I knew Hobart's automobile and I know Davis Currie. At 5 o'clock in the morning someone knocked at the front door and I got up and it was Davis Currie. He wanted to see his mother, who was living upstairs. I went on the back porch and I saw Dave get into the car, but before leaving he lighted a cigarette and I saw Davis and his sister in the car. I didn't see Hobart or anyone else in the car . . ."
And on cross-examination he continued: "While I was up, I saw this young man Davis come . . . I knew his mother was living upstairs. He went upstairs to talk to her. He stayed 15 or 20 minutes . . . His sister was in the car, on the front seat, on the opposite side . . . Dave was under the wheel."
Mrs. C. L. Hensley, also witness for defendant, testified: "I am Hobart Frye's sister. Hobart was at my father's house that night. My father was very sick at the time. He left there around 11 o'clock . . . I know Hobart's car. I saw other persons driving it at 5 o'clock Monday morning. I was acting as nurse at my father's house. I went on duty at 11:00 and came off at 5:00. I saw Davis Currie and his sister Pauline Currie and Hobart was not in the car. I was in my car when they drove up and I waited there a minute to see who it was . . ."
Then on cross-examination, she continued in part: ". . . I saw my brother Roger that morning when I left . . . Then I walked on out and got into my car . . . My car was on the back . . . This other car drove up to my car within a few feet, possibly 10 feet . . ."
John Frye, also a witness for defendant, in pertinent part testified: "I live about 40 or 50 yards from my father's house. I am brother of Hobart Frye and I saw him the night of November 16th. Hobart left about 11:45. I know his car as I have seen it many times. I saw it about 5 o'clock in the morning. A road runs by the corner of my house. For a car to come through my yard almost hits the house. This car started through there making quite a bit of racket and running through the flowers. My wife said `Get up and see who that is.' I noticed it was Hobart's car. I did not see him then . . . the car came back through the yard and I saw a man and a woman in the car. I recognized the man as Dave Currie but I couldn't recognize the woman." *Page 587 
Defendant also offered evidence tending to show that he was engaged in gainful occupation, introducing bank deposit slips and checks to indicate his engagement in the pursuit of his occupation, with employees under him.
When the defendant rested his case the State offered testimony of the night watchman for the town of Pinehurst. He testified that he knows defendant Hobart Frye and Polly Currie; that he saw them on the night traveling in a Plymouth coupe, — Hobart driving, — she riding with him; that he did not see any other person in the car; that he talked to Hobart between 10 and 15 minutes at right around 2 o'clock, — talking over the general run of things; that Polly asked him where he went from where he then was; that defendant heard what was said; that at that time he was 350 to 400 yards from the Greenhouse; that in response to the question asked him, he told her that he went from there to the powerhouse, and that she told him which way he went when he left the Greenhouse . . . the Manor Hall, and . . . to Holly Inn . . . said she had been that route and punched the keys herself; that the car moved when he left; that it went right around by the laundry and the laundry yard in the direction of the Pinehurst Greenhouse; that in the course of his round he got to the Greenhouse at 4 o'clock that morning; and that he couldn't tell there was anything wrong, — just shined his light, and saw the door closed and kept going.
At the close of all the evidence, defendant renewed his motion for judgment as in case of nonsuit. Motion denied. Exception.
Verdict: Guilty of larceny.
Judgment: Confinement in the State Central Prison at Raleigh for not less than three nor more than five years.
Defendant appeals therefrom to Supreme Court and assigns error.
While on this appeal defendant assigns as error twenty-one exceptions as shown in the record, and states in his brief seven questions as involved on this appeal, he designates no specific exceptions in the argument advanced in his brief, but seems to devote attention, in the main, to the contention that he is entitled to judgment as of nonsuit.
Exceptions in the record not set out in appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned by him. Rule 28 of Rules of Practice in the Supreme Court,221 N.C. 562, and numerous cases cited thereunder. *Page 588 
Nevertheless, we have adverted to all of the exceptions, and find in them no sufficient error to justify sending the case back for new trial. However, we deem it expedient to treat the question of nonsuit, so earnestly urged by counsel for defendant.
The court submitted the case to the jury on two counts, breaking and entering, and larceny, — instructing the jury that any one of three verdicts might be rendered, guilty of the charge of breaking and entering, etc., guilty of larceny, or not guilty. It is true the court first gave the instruction that one of two verdicts, guilty or not guilty, could be returned by the jury; but the jury was called back into the courtroom and properly given the instruction first above stated.
Now, then, are the facts and circumstances shown in the record of sufficient force and import to support a verdict of guilty of larceny, of which defendant was convicted? We think so.
The State relies wholly upon circumstantial evidence to connect defendant with the crime committed. In passing upon the legal sufficiency of such evidence for a conviction of a felony, as in this case, "the rule is that the facts established or advanced on the hearing must be of such nature and so connected or related as to point unerringly to the defendant's guilt and exclude any other reasonable hypothesis." Stacy, C.J., in S. v. Harvey, 228 N.C. 62, 44 S.E.2d 472; S. v. Coffey,228 N.C. 119, 44 S.E.2d 886.
However, unlike the factual situations and circumstances in the Harveyand Coffey cases, the facts and circumstances detailed in the evidence offered by the State in the case in hand is of legal sufficiency for a conviction of the felony of larceny.
We have here evidence tending to show that the safe and its contents were taken in the nighttime and hauled away in a four-wheel motor vehicle. We also have evidence tending to show that the motor vehicle used in hauling the safe is the automobile, a Plymouth coupe, owned by defendant. And the evidence as to the shoes of defendant fitting the tracks of a man, apparently made in pushing the vehicle when stalled, and as to the sales slip which was found at the place where the vehicle was stalled, is sufficient for a finding beyond a reasonable doubt that defendant was present and was implicated in the larceny charged. Moreover, such finding would not be, and is not inconsistent with the evidence offered by defendant tending to show that others were seen operating defendant's automobile at an early morning hour of the night the crime was committed.
No error. *Page 589