THE WORTH COMPANY v. INTERNATIONAL SUGAR FEED No. 2
COMPANY.

(Filed 1 November, 1916.)

1. **Bills and Notes—Negotiable Instruments—Prima Facie Evidence—Due
   Course—Statutes.**

   Where there is neither allegation nor evidence that a negotiable in-
   strument sued on is defective (Revisal, sec. 2204), and the plaintiff claims
   as a holder in due course, his introduction of the instrument duly in-
   dorsed makes out a *prima facie* case under the statute, Revisal, sec. 2201,
   that he was a purchaser for value, in good faith, before maturity, and
   without notice of any defect in the title of the person negotiating it.

2. **Same—Banks and Banking—Principal and Agent.**

   Where a bank discounts a paper and places the amount, less the dis-
   count, to the credit of its depositor, the indorser, with his right to check
   on it, but the bank reserves the right to charge back the amount if the
   note is not paid, by express agreement or one implied from the course
   of dealings, the bank is an agent for collection and not a purchaser of
   the paper in due course.

3. **Same—Impeaching Evidence—Contradictory Evidence—Questions for Jury.**

   Where the bank, claiming as an indorsee of a negotiable paper in due
   course, has made out a *prima facie* case by introducing the paper in evi-
   dence, and the testimony of its witnesses tends to show an arrangement
   with its indorser that it was to be charged back to his balance in case
   of nonpayment, which had always been sufficient; and, to the contrary,
   that no such agreement had been made, expressed or implied, but that
   the indorser had no liability therefor, except as such: *Held*, that while
   the plaintiff should not be permitted to impeach the testimony of its own
   witness, it could show the fact to be otherwise than he had testified; and
   having made out a *prima facie* case, the question was for the jury to find
   the fact of the agreement upon the conflicting evidence.

4. **Bills and Notes—Negotiable Instruments—Deposits—Agreement—Intent—
   Evidence.**

   Where a bank takes a negotiable paper by indorsement from its de-
   positor, who had always sufficient funds there to protect its payment, and
   gives him credit for the amount, with the right to check on it, the trans-
   action is evidence that the bank purchased for value; and when the evi-
   dence is conflicting as to an agreement between them that the bank
   should charge the item back upon *nonpayment*, it is for the jury to de-
   termine the intent of the parties, upon which they may consider the
   course of dealings, the rate of discount, the state of the account, and
   other relevant circumstances. *Latham v. Spragins*, 162 N. C., 408, cited
   and distinguished.

APPEAL from *Peebles, J.*, at April Term, 1916, of NEW HANOVER.

This is an action brought by the plaintiff against the defendant feed
company, before George Harriss, justice of the peace, to recover the

amount of $106.50, claimed by the plaintiff to be due and owing to it by the defendants for commission on certain goods sold. An attachment was issued against the proceeds of a certain draft in the Murchison National Bank, and the Bank of Commerce and Trust Company of Memphis intervened and claimed ownership of draft. Judgment was rendered in the justice's court against the defendant, and the intervenor, the Bank of Commerce and Trust Company, appealed to the Superior Court.

In the Superior Court, when the case came on for trial, the plaintiff offered evidence as to its debt, and the intervenor offered evidence as to the ownership of the draft. The following issues were submitted to the jury, the first issue being submitted at the request of the plaintiff and the second at the request of the intervenor:

First. What amount, if any, is plaintiff entitled to recover? Answer: "$106.50."

Second. Is the Bank of Commerce and Trust Company, the intervenor, the owner of the proceeds of the draft attached in the cause, and entitled to possession of the same?

The evidence of the debt was not disputed, and the court directed the jury to answer the first issue "Yes; $106.50," if they believed the evidence. There was no exception taken by the defendant, as it did not appear and make a defense, but appearance and defense was made by and for the intervenor, Bank of Commerce and Trust Company.

The court directed the jury to answer the second issue "No," and the intervenor, the Bank of Commerce and Trust Company, excepted and appealed to the Supreme Court, only its right being involved in this appeal.

The feed company sold a car of feed to J. H. Watters of Wilmington, N. C., and drew a draft with bill of lading attached for the purchase price.

The feed company then indorsed the draft and bill of lading, and delivered the same to the intervenor, the Bank of Commerce and Trust Company, and the trust company forwarded the same to the Murchison National Bank at Wilmington for collection.

The draft was paid, and the plaintiff attached the proceeds in the possession of the Murchison Bank as the property of the feed company.

The material part of the testimony offered by the intervenor, the Bank of Commerce and Trust Company, was in substance as follows:

E. L. Rice testified: "I live at Memphis, Tenn. Am vice president of the Bank of Commerce and Trust Company. The Bank of Commerce and Trust Company is a corporation engaged in the banking business and also title and guaranty business. Its main business is

banking business. It is located in Memphis, Tenn. It is a large bank as compared with other banks in the city of Memphis. I know of a certain draft that was drawn on Joseph H. Watters of Wilmington, N. C., by the International Sugar Feed No. 2 Company for the sum of $280. That draft was handled by the bank on 19 November, 1914. The draft was discounted and passed to the credit of the International Sugar Feed No. 2 Company, and was discounted at the rate of $2.50 a thousand. The date the item actually passed to the credit of the International Sugar Feed Company was 19 November, 1914. We purchased the draft and put it to the credit of the International Sugar Feed Company at rate of discount. There was no agreement that passed between the Bank of Commerce and Trust Company and the International Sugar Feed Company with reference to charging back against the International Sugar Feed Company the proceeds of this draft, which was not paid. We had no conversation with them upon that subject. We had no written agreement of anything of that kind in advance about it. I cannot answer the question as to whether anything was said, as the draft was handled by the teller, but the records show nothing except that it was discounted and put to their credit; that is all.

"I do not remember the amount of this draft in question. I have a record of it, and that shows $280, less 70 cents discount. That is the usual discount, because the draft is drawn with exchange. I think the draft was drawn at sight. I would not say positively. That is what it would cost a person going into our bank to cash a draft drawn on Wilmington for that amount with the bill of lading attached. The records show that the bill of lading was attached to this draft, but I do not know what it covered. The bill of lading was sent with the draft to Wilmington and it was afterwards paid. It is not customary for us to charge drafts back when we handle them with bill of lading attached when the draft is dishonored and sent back. It is customary for us to get check for them. We will get a check for them. They have never refused to give us a check; but in the event they refused to give us a check we would charge it back to their account. When a draft is dishonored and comes back either the customer or the indorser for whom it is cashed covers the dishonored draft with a check. Our bank, so far as I know, had no agreement with the International Sugar Feed Company, No. 2, by which the bank should lose the proceeds of this draft if it was not paid. On the contrary, my assumption is that the agreement was that if the draft was not paid the International Sugar Feed No. 2 Company would cover it, and if they were not willing to cover it voluntarily, and it came to a question of who should lose

the draft, we would arbitrarily charge it back to their account. I have an idea of what the average balance of the International Sugar Feed Company was for the last two years. It was a good balance. They usually kept a good, large balance, and since 19 November, 1914, that balance has run largely in excess of $280; I think it has. This was not a collection draft; we didn't handle it as a collection draft. It was handled as a cash item, and all drafts are handled with the idea that if the draft is not paid the International Sugar Feed Company would, of course, indemnify us against loss. There was no agreement with Mr. Hall, representing the International Sugar Feed Company, about this specific draft, that this item would be discounted with the understanding that if it was not paid by the drawee that he would not permit us to lose anything on it. The draft was deposited in the Bank of Commerce and Trust Company, and the proceeds went to the credit of the Sugar Feed Company. We had no agreement about this specific draft whatever. It was put to their credit, and we sent it to the party on whom it was drawn. Of course, we expected to get our money from the party on whom it was drawn originally. If we could not get the money from him, we would naturally go back on Mr. Hall. We had a custom of discounting Mr. Hall's drafts. That is, drafts of the International Sugar Feed Company, as they were presented to the teller. We handled them every day. The teller did not make any agreement with him. He took off the discount that it was customary to take off of drafts. The teller didn't agree on it. The teller only had instructions to obey these rules, which are laid down by some officer of the bank. He was acting under orders of the bank, and there was no rule made to the teller that if a draft was not paid that the customer should cover it. That is the custom. The general rule is that if the draft is dishonored by the party on whom it is drawn, then it is covered by the party who draws the draft or the indorser who cashes it. It is a fact that Mr. Hall is advised of this situation, and he understands that if we have to pay on the bond that he will protect us and indemnify us. The bank doesn't lose anything, no matter which way the litigation goes. The amount of the draft discounted for the International Sugar Feed Company was passed to its credit and it was subject to their check. That is different from a draft taken for collection. When a draft is taken by the Bank of Commerce and Trust Company simply for collection, it is not passed to the credit of the party who delivers it to the bank until it is finally paid. We consider that a party who makes a draft is legally bound to pay that draft, and we also consider that he is not only morally and legally bound, but that he is financially able to pay a draft if it is dishonored by the drawee. Our expectation

to collect from the International Sugar Feed No. 2 Company in this case was not at all different from our expectation to collect from any person who indorses any paper which is discounted or purchased by the bank and indorsed for.

"Since the foregoing, I have been authorized by Mr. Hall to answer the question relative to the balance to the credit of the International Sugar Feed No. 2 Company at the close of the business on 19 November, 1914, and at the close of business on 15 March, 1916, and upon examination of the books I find the balances to be as follows:   Balance 19 November, 1914, $17,128.88.   Balance 15 March, 1916, $16,926.44."

Will A. Hall testified: "I am connected with the International Sugar Feed No. 2 Company as resident manager at Memphis, Tenn.   This is a suit in regard to a certain draft drawn on Joseph H. Watters of Wilmington by the International Sugar Feed No. 2 Company.   The bill of lading covering a car-load of feed was attached to the draft. The draft, after it was drawn with bill of lading attached, was sold and discounted at the rate of $2.50 per $1,000 on 19 November, 1914, the number of the draft being 2944.   The International Sugar Feed No. 2 Company was paid for the draft by being credited with the amount thereof in cash on said date, 19 November, 1914.

"We had no agreement with the Bank of Commerce and Trust Company that if this draft was not paid it should be charged back to us. We checked against this account that was credited with the draft.   We did not at any time agree with the Bank of Commerce and Trust Company, or any one representing them, that if the draft was not paid it might be charged back to our account.   We did not assume any liability other than that which the law puts on us as a drawer of the draft. No person at Memphis, Tennessee, other than myself, has any authority to make an agreement of any kind with a bank with reference to a matter of this kind on behalf of the International Sugar Feed No. 2 Company.

"The Bank of Commerce and Trust Company still owns the draft or its proceeds.   I mean to say that the Bank of Commerce and Trust Company still owns the proceeds of this draft, and we have drawn against the proceeds of it as cash account that was credited when the draft was sold.   I do not know, if the Bank of Commerce and Trust Company still has the proceeds of the draft, to what account it is placed.   I know that the Bank of Commerce and Trust Company has not charged our account with this $280.   I have no knowledge to the effect that the Bank of Commerce and Trust Company, in case it is not allowed to retain the proceeds of this draft, is going to look to us for this $280.   We, the International Sugar Feed No. 2 Company,

did not assume any liability whatever. I mean to say that if we as-
sumed any liability other than being the makers of the draft—which
we did not—as to the legal phase of that, I am not advised. There
would be no interest, if the Bank of Commerce and Trust Company
fails to collect the proceeds and looked to us for the payment of this
$280, since they have already been remitted the proceeds of the draft.
There is no agreement between the International Sugar Feed No. 2
Company and the Bank of Commerce and Trust Company that in case
the Bank of Commerce and Trust Company has to respond on its bond
in Wilmington, that we expect to pay back the money to the Bank of
Commerce and Trust Company. There is no agreement of that nature.
Inasmuch as there is no agreement or any contract between the Inter-
national Sugar Feed No. 2 Company and the Bank of Commerce and
Trust Company, that is, as far as I can answer, and I do not know
that they expect us to reimburse the Bank of Commerce and Trust
Company to the extent of this draft in the case the Bank of Commerce
and Trust Company has to pay it. As to whether or not we expect to
reimburse them, I could not testify as to problematical matters, or as to
logical proceedings that might be involved in this case. In reply as to
whether we, the International Sugar Feed No. 2 Company, ever ex-
pected to pay the Bank of Commerce and Trust Company $280, the
proceeds of this draft, in case it has to pay that sum on its forthcoming
bond in Wilmington, I will be obliged to say that inasmuch as there
is no contract or agreement to that effect, and proceedings after this
time would be problematical, and that I or any one else in my position
could not answer that question yes or no. I only know what we intend
to do so far as any contract or agreements with the Bank of Commerce
and Trust Company are concerned, and we have no contract in regard
to this matter. We have no intention in reference thereto, because we
believe this is bank property, and the only interest we have is that of
drawer of the draft, and I cannot answer as to future proceedings. In
reply to the question asked me, if it is ever our intention to pay the
proceeds of this draft to the Bank of Commerce and Trust Company
in case it has to pay on its forthcoming bond at Wilmington, I will
say that it is not our intention unless we are made to pay it. I have
never told Mr. Rice that, as the matter has never been discussed with
us. If Mr. Rice is under a different impression, he did not get that
impression from me. This matter has absolutely never been discussed
between the International Sugar Feed No. 2 Company and the Bank
of Commerce and Trust Company, as to any refunding on this item of
any character at any time. As to whether we ever had one of our
drafts turned down which we cashed through the Bank of Commerce and

Trust Company, I will say that under some conditions we possibly might, but I do not recall any specific case.   Over a long term of years we have never had a case similar to this. ˌWe might have had, during that long term of years, drafts which have been dishonored, and as to whether we ever permitted the Bank of Commerce and Trust Company to lose anything on any of these drafts, I don't recall those transactions. I don't think the Bank of Commerce and Trust Company ever lost anything on our drafts.   I don't recall under what conditions any others might have been returned.   I don't recall specific instances, and I would not like to give testimony unless I could recite specific instances and circumstances surrounding them, as to whether we ever permitted the bank to lose money on drafts drawn by us.   I don't understand that the effect of this transaction was that the bank was lending us the money on the draft.   I understand it is a discount, the draft becoming the property of the Bank of Commerce and Trust Company, our title in the draft having passed to the bank, as the bank bought it at a price.   We don't consider it a loan."

After this attachment suit was instituted and before the draft was paid at Wilmington, and the proceeds remitted to the Bank of Commerce and Trust Company, the Bank of Commerce and Trust Company did not charge this draft back to the International Sugar Feed No. 2 Company, and the International Sugar Feed No. 2 Company did not pay the Bank of Commerce and Trust Company anything on this draft between the time it was attached and the time the proceeds were remitted at Wilmington to the Bank of Commerce and Trust Company.

The approximate amount of the average balance of the International Sugar Feed No. 2 Company with the Bank of Commerce and Trust Company is about $5,000 to $10,000.

*Rountree, Davis & Carr for plaintiff.*
*John D. Bellamy & Son for defendant.*

Allen, J.   The intervening bank was the holder of the draft duly indorsed, and as there is neither allegation nor proof that the title of the feed company, which negotiated the draft, was defective (Rev., sec. 2204), the only question presented by the appeal is ˙whether his Honor correctly held, as matter of law, that the bank held the draft for collection and not as a purchaser for value.

If it was a purchaser for value, the draft became the property of the bank, and the proceeds could not be attached in the hands of the Murchison Bank as the property of the feed company; but if a mere collecting agent, the proceeds would belong to the feed company and be the subject of attachment.

The holder of a negotiable instrument duly indorsed (and it is not contended that the draft was not negotiable) is, under the statute (Rev., sec. 2201), prima facie a purchaser for value, in good faith, before maturity, and without notice of any defect in the title of the person negotiating it.

If the instrument is negotiable, the holder may, upon proof of the indorsement, rest his case, because the statute says, under such conditions and nothing else appearing, that he is a purchaser for value. *Moon v. Simpson,* 170 N. C., 336, and cases cited.

In this last case the Court says: "The burden is upon the holder of a negotiable instrument payable to order, which has been indorsed, to prove the indorsement '(*Tyson v. Joyner,* 139 N. C., 69), and when he does so he is deemed prima facie to be a holder in due course (Rev., sec. 2208), that is, he is deemed *prima facie* to be a purchaser in good faith for value, before maturity, and without notice of any infirmity in the instrument or of any defect in the title of the person negotiating it. Revisal, sec. 2201. He is not required to prove that he paid value for the instrument, as the statute furnishes this evidence for him. The following authorities and others sustain this position: *Mfg. Co. v. Tierney,* 133 N. C., 630; *Evans v. Freeman,* 142 N. C., 61; *Trust Co. v. Bank,* 167 N. C., 261; *Bank v. Roberts,* 168 N. C., 475."

It follows, as the bank introduced the draft and proved the indorsement, it made out a prima facie case, which it was entitled to have submitted to the jury, and, therefore, there was error in instructing the jury to answer the second issue "No." *Currie v. R. R.,* 156 N. C., 425.

The plaintiff contends, however, that it appears from the oral evidence introduced by the plaintiff that the draft was taken for collection and not as a purchase; that the drawer had at all times a large amount to its credit and that the prima facie case of the bank is rebutted.

The rule prevails with us, and it is supported by the weight of authority elsewhere, that if a bank discounts a paper and places the amount, less the discount, to the credit of the indorser, with the right to check on it, and reserves the right to charge back the amount if the paper is not paid, by express agreement or one implied from the course of dealing, and not by reason of liability on the indorsement, the bank is an agent for collection and not a purchaser. *Packing Co. v. Davis,* 118 N. C., 548; *Cotton Mills v. Weil,* 129 N. C., 452; *Davis v. Lumber Co.,* 130 N. C., 176, and *Bank v. Exum,* 163 N. C., 202.

The difficulty with the plaintiff in the application of this principle is, first, while a party cannot impeach his own witness, he may show the facts otherwise than as testified to by him (*Smith v. R. R.,* 147 N. C., 608), and the bank had the right to rely on its prima facie case, although

the oral evidence tended to rebut it; and, secondly, all of the evidence introduced did not necessarily lead to the conclusion that the bank was a collecting agent.

The witness Rice, vice president of the bank, testified that the bank purchased the draft and put the amount to the credit of the feed company with the right to draw on it, and that there was no agreement with reference to charging back the proceeds if the draft was not paid. His cross-examination weakens this statement, and furnishes evidence of the contention of the plaintiffs, that there was an agreement, expressed or implied, to charge back the draft, as he says that if the feed company had not assented to charging it back he would have done so arbitrarily.

The witness Hall, who was the manager of the feed company, testified that the draft was sold to the bank, and the amount credited as cash to the feed company, with the right to draw on it; that there was no agreement that it should be charged back, and, in substance, that the feed company did not expect to pay the draft unless compelled to do so by law.

This was at least evidence of a purchase by the bank.

The other position taken by the plaintiff, that the bank is not a purchaser for value because the drawer had at all times a considerable amount to his credit, is supported by authority, *Mann v. Bank* 30 Kan., 421; *Blake v. Bank,* 79 Ohio St., 189; *Citizens Bank v. Cowles,* 180 N. Y., 346; Mod. Am. L., 119; and other cases hold to the contrary, that if an unqualified credit is given, it is as if money was paid, and is a purchase. *Wassen·v. Lamb,* 120 Ind., 514; *Bank v. Loyd,* 90 N. Y., 535; *Taft v. Bank,* 172 Mass., 365; *Williams v. Cox,* 97 Tenn., 555; *Aebi v. Bank,* 124 Wis., 76; *Hoffman v. Bank,* 46 N. J. L., 607; *Armstrong v. Bank,* 90 Ky., 436; *Hazlett v. Bank,* 132 Pa., 118; *Milling Co. v. Bank,* 18 L. R. A. (N. S.), 44; *In re Bank,* 56 Minn., 119; *Piano Co. v. Aulo,* 86 A. S. R., 782. Still others, which in our opinion are supported by the better reason, hold that crediting to the account of the drawer or indorser with the right to check on the account is evidence of a purchase for value, without regard to the state of the account, and that the real determinative question is as to the intention of the parties, to be determined as a fact. *R. R. v. Johnson,* 133 U. S., 566; *Burton v. U. S.,* 196 U. S., 302; *Shaw v. Jacobs,* 89 Iowa, 713; *Ditch v. Bank,* 47 A. S. R., 389, and extended note; *Strong v. King,* 31 Ill., 1; 7 C. J., 599; *Bank v. Summers,* 7 L. R. A. (N. S.), 695, and note; 3 R. C. L., 633.

Was it the mutual understanding and intention that the title should pass unconditionally to the bank, with no right to charge back except by

reason of the indorsement, or was it the intention of the parties that the title should only pass conditionally, and that credit should be given temporarily for the convenience of the parties, with the right arising by express or implied agreement to charge back?

If the first, the bank would be a purchaser for value and the owner, and, if the second, it would be an agent for collection.

In passing upon the question of the intention of the parties, it is competent to consider the course of dealing, the rate of discount, the state of the account, and other relevant circumstances.

There is a statement in *Latham v. Spragins,* 162 N. C., at page 408, apparently in conflict with the conclusion we have reached, but it was not necessary to the decision of the case, as it appeared that Spragins was indebted to the bank, and it can be distinguished from the present case because it is based on the supposition that the bank incurred no increased obligation; whereas, if the contention of the bank in this case is true, it incurred the increased obligation of paying the amount credited to the depositor upon its check.

We are therefore of opinion it was error to instruct the jury to answer the second issue "No."

New trial.