STATE v. JOSEPH C. FULK.

(Filed 24 May, 1950.)

**1. Criminal Law § 52a (1)—**

On motion to nonsuit the evidence must be taken in the light most favorable to the State. G.S. 15-183.

**2. Criminal Law § 52a (3)—**

In order for circumstantial evidence to be sufficient to sustain conviction of a felony the circumstances must be of such a nature and so connected or related as to point unerringly to defendant's guilt and exclude any other reasonable hypothesis.

**3. Homicide § 25—Circumstantial evidence held sufficient to sustain conviction of first degree murder.**

Evidence tending to show that deceased was shot and killed by a rifle bullet which was fired from the direction of defendant's trailer, some 110 feet away, that immediately thereafter there was a great deal of noise from persons screaming and hollering and from sirens of an ambulance and of an officer's car coming to the scene, that an officer went to defendant's trailer and found defendant therein, that defendant denied knowing that a man had been shot, and without the name of the victim having been mentioned, inquired whether the officer was accusing him of shooting the deceased, calling his name, that a .22 calibre rifle and an empty shell were found in the trailer, smelling of powder, together with evidence that the bullet taken from deceased's head was of the same weight as a .22 long rifle bullet, *is held* sufficient to support defendant's conviction of murder in the first degree.

APPEAL by defendant from *Moore, J.,* at January Term, 1950, of STOKES.

Criminal prosecution upon a bill of indictment charging that defendant, Joseph C. Fulk, with force and arms, at and in Stokes County, feloniously, willfully and of his malice aforethought, did kill and murder W. A. Wall contrary to the form of the statute, etc.

Upon arraignment, defendant pleaded not guilty.

And upon the trial in Superior Court, the State offered evidence tending to show that W. A. Wall came to his death on 8 October, 1949, at about 12:45 o'clock p.m., while sitting on a bench in front of, or on the south side of his place of business, a grocery store and service station combined, in King, North Carolina, as the result of a wound inflicted by a bullet of .22 rifle calibre. The bullet, as testified by a doctor, entered "right back behind the left ear about half-way from there to the middle of the head and ranged toward the upper part of the right eye, through the lower part, slightly upward." The witness, Billy Burge, testified that, while his automobile was being serviced at the Wall Service Station,

he was sitting on a bench to the left of, and with W. A. Wall, facing same way; that no one else was out there; that he heard a rifle shot,—sounded like a .22; that about the time he heard the shot Wall fell off in front of him, face forward; and that he, Wall, did not say anything after he fell.

The State, in support of the charge against defendant, relies upon incriminating circumstances. And in this connection, the evidence offered by the State tends to show the following to be the factual situation at and surrounding the scene of the homicide:

King, North Carolina, is situated on Highway No. 52 between Winston-Salem on the south and Mt. Airy on the north. The store and service station of W. A. Wall is located in King on the east side, that is the right-hand side of the highway going from Winston-Salem to Mt. Airy. The store faces, and is on level with the highway, but the service station, or grease pit, is built on back of the store building, and on a lower level. South of the Wall store, and also facing the highway is the garage of Ike Lawson. It has two floors, the front and upper one faces, and is on level with the highway, and the lower and rear one is a garage. There are windows, but no doors on the side of the Lawson garage next to the Wall store. The witnesses variously estimate the distance between the Wall store and the Lawson garage as between 150 and 300 feet,—more accurately about 150 feet. And the evidence tends to show that a street runs east from the highway immediately south of the Wall store and service station,—the latter opening on the side of this street.

The evidence offered by the State also tends to show the location of other buildings referred to hereinafter. The Clyde Hauser house is right behind the Wall service station, probably 30 or 40 feet from the rear of it. The Jim Dodson house is just across the street from the Hauser house. It is the first house on that side of the street. But there is an unoccupied telephone booth, six feet by six feet, located on the same side of, and near the edge of the street, between the Dodson house and the highway, and across the street from the Wall service station.

And the evidence offered by the State also tends to show that defendant, at the time of the homicide, lived in a trailer which was "located down behind a wall" between the Wall store and service station and the Lawson garage, about 30 feet from the highway, and 25 or 30 feet from Lawson's garage, and on level with the Wall service station and the lower floor of the Lawson garage. The door of the trailer was 109 or 110 feet from the bench on which W. A. Wall was sitting when he was shot. The trailer was 50 to 75 feet from the Dodson house, and between it and the highway. The trailer was also between the telephone booth and the Lawson garage. It is twelve feet long and seven and a half feet wide, and at the time stood 18 inches above the ground. The door of the trailer is six feet high and

twenty-five inches wide. It opened outside on the right. The bottom of the door is three feet eight inches from the bottom of the glass in the door. There was no obstruction between the door of the trailer and the bench on which W. A. Wall was sitting when shot. Sheriff Helsabeck testified that he took position inside the trailer to the right of the door, and sighted with a rifle in direction of the bench, and there was room for both, that is, to take the position and to sight with the rifle.

The State also offered several witnesses who testified about hearing the shot. Billy Burge, after testifying that defendant had a trailer right below, and right behind us, said that the shot sounded like it came from behind . . . sounded close by.

J. T. Wall, son of deceased, testified that he was in the grease pit greasing Burge's car, with his back to the trailer; that he heard the shot, that it sounded like a rifle; and that it came from behind him.

Mrs. Dodson testified that she was at home alone, lying on the couch, dozing, in living room away from trailer, with radio on, and the front door open, and the shot waked her up; that it sounded like a rifle; that she couldn't tell what general direction it came from; and that "it sounded loud enough as if it had been in my living room."

Mrs. Hauser testified that she heard the shot; that it sounded like a rifle; that she was on her back porch, watering flowers; and that the shot sounded like it came from the front of the house in that general direction,—like it was pretty close.

Joe Lawson testified that he was standing on the third step from the top floor of the Lawson garage; that he heard the shot; that it didn't sound too loud; that he couldn't say if it was a shotgun or a rifle shot; and that it didn't impress him so that he observed the direction of it.

Robert Rierson testified that he was in basement greasing Billy Burge's auto when he heard the shot; that it was close; that the sound came in the wash pit very strong from behind him—the direction of Mr. Fulk's trailer; that it was a rifle shot,—seemed like a dead sound; that he could tell it was different; and that it struck his attention when he heard it.

And Roberta Wall, daughter of deceased, testified that she was in the Wall store when she heard the shot; that "the shot came from between those two buildings,"—Lawson's garage and her father's store; that she could tell the direction from which it came; and that "the sound was different . . . sounded dead."

The State's witness, Virginia Meeks, testified that as she, with a four year old child, came up the side street by the Wall service station going to her father's home, a ten minutes walk, about 12:30 o'clock, she saw Mr. Fulk, the defendant, sitting in a chair in front of the trailer, but that she saw no one else in the area between street and the garage and Mrs. Dodson's and the highway; that about fifteen minutes later she

heard somebody screaming down in the direction of Mr. Wall's and that she later learned that Mr. Wall had been shot.

And the witness Billy Burge testified that after the shot was fired, he did not see anybody around there, down about the trailer or anywhere in there.

To like effect is the testimony of J. T. Wall, Mrs. Dodson, Mrs. Hauser and Roberta Wall.

The evidence offered tends to show that there was a lot of noise around there after W. A. Wall was shot,—such as persons screaming and holler-ing, and the sirens of an ambulance and of officer's car coming to the scene. J. T. Wall, Mrs. Dodson, Ike Lawson, and Robert Rierson each testified that immediately after the shot was heard, the screaming of Roberta Wall was heard, and there is testimony that others screamed and hollered; that ambulance came in 15 or 20 minutes after the shot, and that several officers soon arrived.

The State further offered testimony of three State Highway patrolmen, and of Sheriff Helsabeck as to what they found, and what transpired when they went to the trailer of defendant. In this connection, Patrol-man Gwaltney testified substantially as follows: That he heard of the shooting when he was in the vicinity of Pilot Mountain, 10 or 12 miles away; that he immediately came to the scene of the shooting; that quite a few people were there, 100 or 150; that approximately 10 minutes later, after he had looked around, he and Patrolmen Williams and Lavely went directly from the bench to the trailer; that he knocked on the trailer door, and no one answered; that as he stepped up a couple of small steps and looked in the glass, defendant Fulk unlocked the trailer door; that on the left, inside, there was a ".22 rifle setting propped against the door facing"; that he picked up the rifle and handed it to Patrolman Williams, and (quoting Gwaltney), "I asked Mr. Fulk if he knew a man had been shot. He says, 'No, I haven't, I don't,' and I says 'Fellow, you mean to tell me with all this screaming and hollering going on you don't know anything has happened here,' and he says 'You are not trying to accuse me of shooting Mr. Wall, are you?' Says 'Me and him good friends, I buy groceries from him.' Up to that time no one there told him who had been shot, or suggested Mr. Wall had been shot . . . an empty car-tridge was found in behind the bed on the trailer floor . . . the cartridge and also the gun had an odor of powder . . . the type of cartridge was .22 calibre long . . . When the defendant came to the door he was only dressed in riding boots and riding pants, and I won't say what kind of shirt he had on, . . . he said he had been asleep. The weather that day was very warm. The door and windows of this trailer were closed . . . He was dressed. The covers of the bed had not been disturbed, but it

did look like somebody had been sitting on them or maybe laying on them . . ."

And there was expert testimony tending to show that the empty shell had been shot in the rifle found in defendant's trailer, and that while the bullet taken from the wound in Wall's head was too battered to admit of comparison and identification with bullets shot from this rifle, the bullet corresponded in weight with a .22 long rifle bullet.

There was testimony that the window in the trailer door was partially covered with a curtain,—there being approximately a two or three inch space in the center; that while the screen was fully in place, at the end next to the latch on which the door opened, the pins were completely out of the trailer door, but still holding into the screen frame; that the rear pegs were partially put into the trailer door, but could be removed by hand; that four of them were all loose,—the two near the latch were just stuck into the window frame; that other window screens in the trailer were fastened in the same way, but the pegs in the other screens were tight; that the windowpane itself was closed at that time, but that it has an adjustable handle.

Sheriff Helsabeck testified that defendant made these statements to him : "It wouldn't have been possible for anybody to get my gun after I went to sleep at 12 :00 o'clock before I woke up, unless they had a key; the door to my trailer was locked; nobody else had a key; nobody been in the trailer all morning except me." And that, in answer to question if he were a pretty good shot with a rifle, he said, "Well, I have killed a few squirrels." And, again, in reply to question if he shot Mr. Wall, defendant "always said if he shot him, he didn't know anything about it."

The State also offered testimony of Roberta Wall tending to show that her father, the deceased, had operated the store for about three and a half years; that defendant Fulk lived in the trailer around two years, and had been a customer at the store ever since he had had his trailer there, and was in and out of the store every few minutes; but that on 16 September, approximately three weeks before the shooting, she told defendant that her father had told her not to let him have any more groceries if he didn't pay the money; and that defendant never came in or close to the store any more; but would go to Lawson's station and up the steps and around, out of his way, to go to King.

Verdict : Guilty of murder in the first degree with recommendation of life imprisonment.

Judgment : Confinement in the State's Prison at hard labor for life.

Defendant appeals therefrom to Supreme Court, and assigns error.

STATE *v.* FULK.

*Attorney-General McMullan and Assistant Attorney-General Bruton for the State.*

*Leonard H. van Noppen and Dallas C. Kirby for defendant, appellant.*

WINBORNE, J. The assignment of error, other than formal ones, presented by defendant for consideration on this appeal brings into question only the correctness of the ruling of the trial court in denying motion for judgment as in case of nonsuit made by defendant at the close of the evidence. G.S. 15-183.

In passing upon motion for judgment as of nonsuit in a criminal prosecution under G.S. 15-183, the evidence is to be taken in the light most favorable to the State.

And in passing upon the legal sufficiency of the evidence, so taken, when the State relies upon circumstantial evidence for a conviction of a felony, as in the present case, "the rule is that the facts established or advanced on the hearing must be of such a nature and so connected or related as to point unerringly to the defendant's guilt and to exclude any other reasonable hypothesis." *S. v. Stiwinter,* 211 N.C. 278, 189 S.E. 868; *S. v. Harvey,* 228 N.C. 62, 44 S.E. 2d 472; *S. v. Coffey,* 228 N.C. 119, 44 S.E. 2d 886; *S. v. Minton,* 228 N.C. 518, 46 S.E. 2d 296; *S. v. Frye,* 229 N.C. 581, 50 S.E. 2d 895.

Applying these principles to the present case, we are of opinion and hold that the evidence, shown in the record on this appeal, as hereinbefore stated, taken in the light most favorable to the State, is legally sufficient to take the case to the jury, and to support a verdict of guilty on the charge under which defendant stands indicted. The factual situations and circumstances here are different from those in the cases of *S. v. Jones,* 215 N.C. 660, 2 S.E. 2d 867, and *S. v. Cromer,* 222 N.C. 35, 21 S.E. 2d 811, on which defendant relies, as well as in the *Harvey* and *Coffey* and *Minton cases, supra.*

Hence, after careful consideration, we find in the judgment from which appeal is taken

No error.