## STATE v. EDWARD MITCHUM.

(Filed 12 December 1962.)

**1. Criminal Law § 85—**

The introduction in evidence by the State of a declaration or admission by defendant does not preclude the State from showing that the facts are other than as related in defendant's declaration.

**2. Criminal Law § 101—**

When evidence offered by the State is contradictory, some tending to inculpate and some tending to exculpate defendant, the conflicting evidence carries the issue to the jury.

**3. Criminal Law § 98—**

The jury may believe a part and reject a part of defendant's statements introduced in evidence by the State.

**4. Homicide § 20— Where the State's evidence permits diverse inferences on question of self-defense nonsuit is correctly denied.**

The State introduced in evidence statements by defendant tending to show that deceased had made an unprovoked attack upon defendant with a knife, and that during the assault defendant took a knife from his pocket and cut deceased, inflicting the fatal wounds. Other evidence offered by the State tended to show that deceased was unarmed and also tended to contradict certain portions of defendant's statement in regard to the conduct of deceased immediately after the infliction of the fatal wounds. *Held:* The State is not precluded by defendant's statements

tending to establish self-defense, since the jury was entitled to accept part of defendant's statements and reject other parts, and the evidence is sufficient to sustain a verdict of guilty of manslaughter.

APPEAL by defendant from *Farthing, J.,* April 1962 Term of Mc-DOWELL.

The defendant was charged with having murdered Thurmond Harris on March 26, 1962. He plead not guilty; he was convicted of manslaughter. From a sentence of imprisonment the defendant appealed.

*T.. W. Bruton, Attorney General for the State.*
*E. P. Dameron for defendant appellant.*

SHARP, J.   The crucial question on this appeal is whether the evidence was sufficient to survive the defendant's motion for nonsuit made at the close of all the evidence.

In summary, the evidence tells the following story:

The defendant and the deceased Harris worked in the same department on the second shift at the Marion Manufacturing Company on Baldwin Avenue in Marion. Defendant was in charge of the department. Six weeks prior to the homicide there had been trouble between the two men in the Mill when Harris had complained that everybody in the department was working against him and that defendant had been talking about him. Defendant had denied the accusation and had cursed him; Harris, a larger man than defendant, had grabbed defendant by the collar and threatened to get him on the outside. As a result of this difficulty, the supervisor suspended Harris for three days. At the end of that time he returned to work with the consent of the defendant; the two men shook hands, and their relations had apparently been friendly from then until the night of the homicide.

There were no witnesses to the homicide. To establish the circumstances of it the State had to rely upon the statement which the defendant made the next morning when he went to the sheriff's office after having been informed that Harris was dead. He told the sheriff, and testified at the trial, that on March 26, 1962 he left the Mill about 11:15 p.m. with D. L. Wood, another employee, and walked north on Baldwin Avenue towards his home. Wood left him at Second Street. Between the Mill and Second Street Harris passed them, driving his automobile south. Just as defendant crossed Third Street, Harris pulled up to the sidewalk and stopped his vehicle headed north. He opened the door on the right and angrily ordered the defendant to get in the car. The defendant refused and asked Harris what was bother-

ing him. Harris got out of the car and responded in abusive language that things were not going right at the Mill. Defendant told him to take his complaints to the Mill office and started walking away. Harris continued his abusive language and, when defendant had gone ten or twelve steps, ran in front of him with an open knife in his left hand, a three-inch blade sticking up from the thumb. Harris grabbed defendant by the collar with his right hand and began hitting him in the mouth and face with his left which held the knife. Defendant's face was never cut during this procedure, but his lip was broken on the inside. While Harris was thus hitting him, defendant struck at Harris several times with his bare fists, took his knife from his pocket, opened it with his thumb, and "switched" at Harris with it.

On the trial, defendant testified as follows:

> "When Harris caught hold of my collar, I did not call anybody. I did not call Mr. Wood and ask him to come up there. Yes, I say that while he had hold of me and had the knife in his left hand, I took my hand and reached down in my pocket and got my knife. Yes, I had to use my thumb to open it. Yes, I was standing and opening my knife and he was standing and hitting me in the face with the knife and did not cut me anywhere in the face. Yes, that is the knife I took out of my pocket and I opened it while I was standing there and switched at him three or four times and he still had hold of my collar. I was swinging at him; I don't know how far I went around; . . . I had my knife somewhere around waist-high. My knife did not ever stop that I know. As soon as I switched around three or four times, I broke and ran. I knocked him loose with my left hand. I never did get loose until I got my knife out."

According to defendant, when he broke loose he had been cut across his coat collar, his left sleeve, and scratched on his right hand and left arm. When he ran from the scene Harris ran after him as hard as he could run for 150 feet to Fourth Street. He then turned around and went back to his car, put on the headlights and started the motor. The defendant went on to his home on Baldwin Avenue, a short distance from Fourth Street, and told his wife what had occurred. At that time, his lips were swollen and his mouth bleeding and he said that he did not know whether he had cut Harris. He then awakened his supervisor, E. D. Lawing, who lived across the street, and reported the matter to him. Thereafter defendant returned home, barred the doors, and sat up until about 3:00 a.m. fearing Harris would come to the home. The defendant denied that he ever intended to kill deceased. He said: "I swiped at him . . . because he was beating

me to death and he had that knife in his hand and I didn't know what he would do to me, and I had to get him off of me."

State Highway Patrolman Burrell testified that about 11:15 p.m. on March 26, 1962, he was called to investigate a wreck on Baldwin Avenue. He found Thurmond Harris dead in the front seat of his 1956 Pontiac automobile which had gone through the heavy steel mesh fence on the edge of the street and stopped on top of two cars in the Mill parking lot ten to twelve feet below the level of the street. An autopsy revealed two stab wounds in Harris' chest cavity. The first one was between the seventh and eighth ribs. It was inclined inward and upward, crossing over the midline into the right ventricle of the heart. The other wound was in the left side in the line back of the armpit. It went through the chest cavity and into the lower lobe of the left lung. Dr. John C. Reese, an expert physician, surgeon, and pathologist, testified that in his opinion a person receiving such wounds could run 150 feet if he ran immediately but, having done so, he would be incapable of walking back that distance.

No knife was found on the deceased or in his car. The deputy sheriff who searched the area involved found no knife or blood on the street. When defendant went to the sheriff's office the following morning, the sheriff saw no cuts or other wounds about his face. The deceased was right-handed. Between 3:00 and 4:00 and 6:00 and 7:00 on the afternoon of the homicide he had borrowed and returned a pocket knife from Harry Lee Gardin, a fellow employee. .

The defendant contends that the version of his fight with deceased which he gave the sheriff makes out a perfect case of self defense and that, having offered it, the State is bound by it. If his narrative of events did make out a complete defense, and if that were all the evidence, the defendant would be entitled to a judgment as of nonsuit. Howver, "(t)he State, by offering evidence of the declarations or admissions of a defendant, is not precluded from showing that the facts are other than as related by him. And when the substantive evidence offered by the State is conflicting — some tending to inculpate and some tending to exculpate the defendant — it is sufficient to repel a demurrer thereto." *State v. Tolbert,* 240 N.C. 445, 82 S.E. 2d 201.

We think the additional evidence offered by the State and the conflicting inferences which arise from the defendant's statement itself were sufficient to make his guilt a question for the jury.

The jury is not required to believe the whole of defendant's statement; they may believe a part and reject a part because they are the triers of the fact. *State v. Mangum,* 245 N.C. 323, 96 S.E. 2d 39. In the instant case, the jury rejected a part. The evidence, considered in the light most favorable to the State, as we are required to do

in passing upon a motion as of judgment of nonsuit, *State v. Haddock*, 254 N.C. 162, 118 S.E. 2d 411, was sufficient to justify the jury in finding that the defendant unlawfully killed the deceased. *State v. Robinson*, 188 N.C. 784, 125 S.E. 617; *State v. Marshall*, 208 N.C. 127, 179 S.E. 427, and *State v. Grainger*, 223 N.C. 716, 28 S.E. 2d 228.

The judgment of the court below is affirmed.

Affirmed.