STATE v. MARGARET RUTH HORTON

No. 22

(Filed 19 November 1969)

**1. Conspiracy § 3—   criminal conspiracy defined**

A criminal conspiracy is the unlawful concurrence' of two or more persons in a wicked scheme, that is, the combination or agreement to do an unlawful thing or to do a lawful thing in an unlawful way by unlawful means.

**2. Conspiracy § 3— overt act — withdrawal of conspirator**

Since the commission of an overt act is not an element of criminal conspiracy in this jurisdiction, an attempted withdrawal by one of the conspirators prior to an overt act in furtherance of the agreement will not prevent a verdict of guilty of conspiracy.

**3. Conspiracy § 3— accomplishment of purpose — necessity**

It is not necessary that the purpose of the conspiracy be accomplished in order for a verdict of guilty to stand.

**4. Conspiracy § 3— union of wills — pretended acquiescence**

There can be no conspiracy unless there is a union of wills; and if one person feigns acquiescence in a proposal of another to pursue an unlawful enterprise, there is no conspiracy.

**5. Conspiracy § 3— conspiracy with self**

One person cannot conspire with himself.

**6. Conspiracy § 3— conspiracy of three or more — union of purpose between two**

If three or more persons conspire to commit a crime, the fact that there is a union of purpose between only two will not bar a prosecution and conviction of the two.

**7. Conspiracy § 6— sufficiency of evidence — unsupported testimony of co-conspirator**

The unsupported testimony of a co-conspirator is sufficient to sustain a verdict, although the jury should receive and act upon such testimony with caution.

**8. Conspiracy § 6— criminal conspiracy to murder husband of defendant — conflicting evidence of State — intent of co-conspirator**

In a prosecution charging that femme defendant unlawfully conspired with two other persons to murder her husband, defendant's motions for judgment as of nonsuit were properly denied, notwithstanding that the co-conspirators, who were witnesses for the State, testified on cross-examination that they never intended to kill defendant's husband but intended only to trick defendant into giving them money, where the State's evidence was also to the effect that defendant asked one co-conspirator to procure someone to kill her husband, that the co-conspirator, with defendant's knowledge, purchased a quantity of bullets for his .38 pistol, that defendant and the co-conspirator went to an airport to meet the other co-conspirator who pretended to have arrived from New York, that defendant directed the co-conspirators to a farmhouse to which her husband went almost every day, that defendant furnished the co-conspirators with a description and some pictures of her husband, and that the co-conspirators accepted $2550 in cash from defendant, one co-conspirator testifying that he "received the money for doing just what we were talking about, to kill him."

**9. Criminal Law § 90— impeachment of own witness**

A party cannot introduce testimony to impeach or discredit the character of his witness.

**10. Criminal Law § 106— defense established by State's evidence — nonsuit**

When a complete defense is established by the State's evidence in a criminal action, a defendant may avail himself of such defense by a motion for judgment as of nonsuit.

**11. Criminal Law § 90— testimony by State's witness as to exculpatory facts**

If the witness for the State testifies to facts against the State's contentions, the State is not precluded from showing the facts to be other than as testified to by the witness.

**12. Criminal Law § 106— nonsuit — where State's evidence is both exculpatory and inculpatory**

When the substantive evidence offered by the State is conflicting — some tending to inculpate and some tending to exculpate the defendant — it is sufficient to overrule a motion for judgment as of nonsuit.

**13. Criminal Law § 106— conflict in testimony of the State — role of jury**

Where the State vouched that its witnesses were worthy of belief as to all of their testimony, and there was conflict in the testimony, it was for the jury, as the trier of the facts, to believe all the testimony or to believe a part and reject a part, or to reject it all.

**14. Conspiracy § 6— sufficiency of evidence — circumstantial evidence**

A criminal conspiracy may be established by circumstantial evidence from which the conspiracy may be legitimately inferred.

ON certiorari to the North Carolina Court of Appeals to review its decision in 5 N.C. App. 141.

Defendant, Margaret Ruth Horton, was indicted by an Iredell County Grand Jury on the charge that she feloniously conspired with Robert Lee James and Carl Ruben Deal to murder one Lee Roy Horton, her now deceased husband. Defendant was tried at the October 1968 Criminal Session of Iredell. The jury returned a verdict of guilty as charged, and from judgment rendered on the verdict she appealed to the North Carolina Court of Appeals. The Court of Appeals found no error in the trial below. Defendant filed a petition for writ of certiorari to the North Carolina Court of Appeals to review its decision pursuant to G.S. 7A-31(c)(3) and G.S. 7A-30(1). The petition was allowed by order dated 11 July 1969.

The State's evidence is summarized as follows:

Robert Lee James testified that in the latter part of April, 1967, by prearrangement, he and defendant met on the "Charlotte Highway" and drove from there to a farmhouse which belonged to defendant. There they discussed certain difficulties defendant was al-

legedly having with her husband and arranged another meeting for the following night. The next day James met defendant at the restaurant where she worked and they talked. They met again that evening and discussed the possibility of hiring someone for the purpose of having something done to defendant's husband. During their discussion James asked defendant, "What do you want to get done to him? Do you want to get him beat up or roughed up or what do you want? She said, 'I want a little more than that.' I said, I don't know, I might know a man who might could do something like that for you. She said, 'What do you think it would cost me?' " James told her he didn't know how much it would cost but that he knew a man in New York who might do it. He asked defendant if she wanted him to contact the man and she answered in the affirmative. Pretending to telephone New York, James placed a call to Taylorsville, North Carolina, from a service station telephone, and spoke to Carl Deal about the matter in defendant's presence. Deal said he was interested but couldn't meet James for a couple of days.

The following day James telephoned defendant and told her that the man would be coming into the Charlotte Airport that Wednesday night and that the man was in New York City. On Wednesday James and defendant met on the "Charlotte Highway." James told defendant that his friend had instructed him to buy a quantity of .38 bullets, so they stopped at a hardware store in Charlotte for that purpose, then drove to the airport. Deal did not appear as arranged; therefore, James had himself paged over the public-address system so that defendant could hear, went back to the car and told her that the man would be there the following night. On the following night they returned to the Charlotte Airport. Defendant and James waited "out front" until it was announced that the flight from New York had arrived. James met Deal inside the terminal building and gave him a .38 pistol. He told Deal "everything was set," bought Deal a pair of sunglasses, which Deal put on, and together they walked back to the car where defendant was waiting. James introduced Deal to defendant as Joe Fratt. Thereafter the parties agreed on a price of $5,000 for Deals' and James' services.

The trio drove from the Charlotte Airport to defendant's farmhouse. During the drive James handed Deal the bullets and Deal loaded the pistol in full view of defendant. After they arrived at the farmhouse they went into an upstairs room. Defendant told James and Deal that her husband came to the farmhouse almost every day and that the windows in the upstairs room would provide a view of the road approaching the farmhouse. She told the men that her hus-

band would arrive in a pickup truck and described him to them. She also gave James some pictures of her husband.

Defendant paid Deal $1250 and arranged to meet James again the following night. The men were supposed to stay at the farmhouse to await Lee Roy Horton's arrival the following morning. Instead of waiting at the farmhouse, James testified that he drove Deal back to Taylorsville; that the next morning they met, divided the $1250, and went back to the farmhouse. They then proceeded to a rendezvous with defendant behind a furniture factory in Statesville where she paid Deal another $1300.

James said that he and Deal then returned to the farmhouse, placed cigarette butts around the upstairs window area, and left. He telephoned defendant the next day, reported that her husband had not appeared at the farmhouse, but said that he and Deal (Fratt) could be at the farmhouse the following night. James later telephoned defendant and told her that Deal had to leave town but would be back in a few days to "do what he was supposed to do." James then called Deal, told him to call defendant, represent himself as a "trusty" at the Wake County jail, and tell her that he was calling for Joe Fratt who was being held for carrying a concealed weapon. Deal was then to instruct defendant to contact James and to come to Raleigh to obtain Deal's release on bond.

James again met with defendant at the farmhouse, where she accused him and Deal of cheating her of $2500 and demanded her money back. James said he was through with the whole affair, and when defendant reached into a large purse, he pulled a gun on her and warned her to end it right there or he would tell her husband what she was trying to do.

James testified that when he called Deal on the day after the call made originally in defendant's presence, he told Deal, "I told him that there was a woman here in Statesville — a woman here in Statesville that wanted to get her husband killed."

On cross-examination James denied ever having had an intent to kill Mr. Horton, and said that Deal had declared he would never kill anyone. He said they were merely making false representations to Mrs. Horton in order to obtain money from her. He stated, however, that he received the money to kill Mr. Horton.

Arthur S. Beckham, Jr., testified as to threats that he had heard defendant make against her husband.

Carl Deal testified concerning his initial contact with Robert James, as follows:

"He called me on the phone and asked me when I would be at home, and I told him, so he come to my house. He said he knowed an old gal in Statesville that we could get a little piece of money off of, and said that she wanted to get something done to her husband, and he said that she wanted to go further than roughing him up, and I said that I wouldn't do nothing like that."

He substantiated the testimony of Robert James as to the events which took place concerning the meetings with defendant and corroborated James' testimony that the men had only intended to trick her into giving them money.

Several months later, after a bombing occurred in Statesville, James told police officers about his and Deal's transactions with defendant.

Defendant offered no evidence.

*Attorney General Morgan, Deputy Attorney General Bullock, and Deputy Attorney General McGalliard for the State.*

*F. Lee Bailey (Boston Massachusetts) and Gardner & Wilson (By: Rossie G. Gardner and Jerry C. Wilson) for defendant.*

BRANCH, J.

Defendant assigns as error the denial of her motions for judgment as of nonsuit and contends that she was denied due process and equal protection of the laws when the Court of Appeals failed to apply the rule that the State is bound by its uncontradicted evidence.

[1]   In *State v. Gallimore*, 272 N.C. 528, 158 S.E. 2d 505, this Court defined a conspiracy as follows:

" 'A conspiracy is the unlawful concurrence of two or more persons in a wicked scheme — the combination or agreement to do an unlawful thing or to do a lawful thing in an unlawful way by unlawful means. (Citing many cases)' *State v. Goldberg*, 261 N.C. 181, 134 S.E. 2d 334; *State v. McCullough*, 244 N.C. 11, 92 S.E. 2d 389. A conspiracy to commit a felony is a felony. *State v. Brewer*, 258 N.C. 533, 129 S.E. 2d 262; *State v. Abernethy*, 220 N.C. 226, 17 S.E. 2d 25. The crime is complete when the agreement is made. *State v. Davenport*, 227 N.C. 475, 42 S.E. 2d 686; *State v. Whiteside*, 204 N.C. 710, 169 S.E. 711; *State v. Knotts*, 168 N.C. 173, 83 S.E. 972. Many jurisdictions follow the rule that one overt act must be committed before the

conspiracy becomes criminal. Our rule does not require an overt act."

**[2-7]**    Since our rule does not require an overt act, an attempted withdrawal by one of the conspirators before an overt act in furtherance of the agreement will not prevent a verdict of guilty of conspiracy. 16 Am. Jur. 2d, Conspiracy, Sec. 29, at 142. Nor is it necessary for the purpose of the conspiracy to be accomplished in order for a verdict of guilty to stand. *Goldman v. United States*, 245 U.S. 474, 62 L. ed. 410. There can be no conspiracy unless there is a union of wills, and if only one person feigns acquiescence in a proposal of another to pursue an unlawful enterprise, there is no conspiracy. One person cannot conspire with himself. *State v. Tom*, 13 N.C. 569; 15A C.J.S., Conspiracy, § 37, p. 730. However, if three or more conspire to commit a crime, the fact that there is a union of purpose between only two will not bar a prosecution and conviction of the two. 15A C.J.S., Conspiracy, § 37, p. 731. The unsupported testimony of a co-conspirator is sufficient to sustain a verdict, although the jury should receive and act upon such testimony with caution. *State v. Tilley*, 239 N.C. 245, 79 S.E. 2d 473.

The rule relating to sufficiency of evidence to carry a case to the jury is concisely stated in the case of *State v. Stephens*, 244 N.C. 380, 93 S.E. 2d 431. We quote therefrom:

" 'If there be any evidence tending to prove the fact in issue or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury.' The above is another way of saying there must be substantial evidence of all material elements of the offense to withstand the motion to dismiss. It is immaterial whether the substantial evidence is circumstantial or direct, or both. To hold that the court must grant a motion to dismiss unless, in the opinion of the court, the evidence excludes every reasonable hypothesis of innocence would in effect constitute the presiding judge the trier of the facts. Substantial evidence of guilt is required before the court can send the case to the jury. Proof of guilt beyond a reasonable doubt is required before the jury can convict. What is substantial evidence is a question of law for the court. What that evidence proves or fails to prove is a question of fact for the jury. *S. v. Simpson, ante,* 325; *S. v. Duncan, ante,* 374; *S. v. Simmons, supra; S. v. Grainger,* 238 N.C. 739, 78 S.E. 2d 769; *S. v. Fulk,* 232 N.C. 118, 59 S.E. 2d 617; *S. v. Frye,* 229 N.C. 581, 50 S.E. 2d 895; *S. v. Strick-*

*land,* 229 N.C. 201, 49 S.E. 2d 469; *S. v. Minton,* 228 N.C. 518, 46 S.E. 2d 296; *S. v. Coffey,* 228 N.C. 119, 44 S.E. 2d 886; *S. v. Harvey,* 228 N.C. 62, 44 S.E. 2d 472; *S. v. Ewing,* 227 N.C. 535, 42 S.E. 2d 676; *S. v. Stiwinter,* 211 N.C. 278, 189 S.E. 868; *S. v. Johnson, supra.*"

[8]    In the instant case the decision must stand or fall upon the testimony of two alleged co-conspirators who, in the course of their testimony when offered as State's witnesses, testified as to the circumstances surrounding the alleged conspiracy, and in their further testimony stated that they never intended to harm defendant's husband. Defendant contends that the State, offering them as its witnesses and worthy of belief, has made out a complete defense entitling defendant to nonsuit. The State, on the other hand, contends that the testimony of the alleged co-conspirators shows such circumstances and conduct as to carry the question of defendant's guilt to the jury.

[9-12]    It is well established in this jurisdiction that a party cannot introduce testimony to impeach or discredit the character of his witness, and when in a criminal action a complete defense is established by the State's evidence, a defendant may avail himself of such defense by a motion for judgment as of nonsuit. Yet, if the witness testifies to facts against the State's contentions, the State is not precluded from showing the facts to be other than as testified to by the witness. *State v. Jarrell,* 233 N.C. 741, 65 S.E. 2d 304; *State v. Todd,* 222 N.C. 346, 23 S.E. 2d 47; *State v. Cohoon,* 206 N.C. 388, 174 S.E. 91; *Smith v. R. R.,* 147 N.C. 603, 61 S.E. 575. It is equally well established that when the substantive evidence offered by the State is conflicting — some tending to inculpate and some tending to exculpate the defendant — it is sufficient to overrule a motion for judgment as of nonsuit. *State v. Mitchum,* 258 N.C. 337, 128 S.E. 2d 665; *State v. Bass,* 255 N.C. 42, 120 S.E. 2d 580; *State v. Mangum,* 245 N.C. 323, 96 S.E. 2d 39; *State v. Tolbert,* 240 N.C. 445, 82 S.E. 2d 201.

[13]    It must be borne in mind that the State offered no evidence to impeach the testimony of its witnesses except for questions as to the past record of the witness James, which were asked and answered without objection. The State vouched that witnesses were worthy of belief as to *all of their testimony,* and where there was conflict in the testimony, it was for the jury to believe all the testimony or to believe a part and reject a part, or to reject it all, because it is the trier of the facts. *Brown v. Brown,* 264 N.C. 485, 141 S.E. 2d 875; *State v. Mangum, supra; State v. Henderson,* 180 N.C. 735, 105 S.E.

339; *State v. Ellis,* 97 N.C. 447, 2 S.E. 525; *State v. Overton,* 75 N.C. 200.

In the case of *Smith v. R. R., supra,* we find the following:

> "While it is accepted doctrine that one who offers a witness 'presents him as worthy of belief,' and except, perhaps, where an examination is required by the law, as in the cases of subscribing witnesses to wills and deeds . . . a party will not be allowed to disparage the character or impeach the veracity of his own witness, nor to ask questions or offer evidence which has only these purposes in view, it is always open to a litigant to show that the facts are otherwise than as testified to by his witness. . . . *And this he may do, not only by the testimony of other witnesses, but from other statements of the same witness, and at times by the facts and attending circumstances of the occurrence itself, the res gestæ."* (Emphasis ours)

The above was quoted with approval in the case of *State v. Cohoon, supra.* See also *Worth Co. v. Feed Co.,* 172 N.C. 335, 90 S.E. 295.

Defendant relies on the case of *Odneal v. State,* 117 Tex. Cr. App. 97, 34 S.W. 2d 595, where an accomplice testified on direct examination that he had entered into a conspiracy with the defendant and testified on cross-examination that he never intended to carry out the agreement. The court submitted this case to the jury on the basis of conflict in the testimony requiring the jury to decide whether the witness intended to carry out the conspiracy.

**[14]** Defendant contends that *Odneal v. State, supra,* is distinguishable from the instant case because here witnesses only testified as to what they were paid to do on direct examination, and testified on cross-examination that they never intended to do it. The fallacy in defendant's argument is that a criminal conspiracy may be established by circumstantial evidence from which the conspiracy may be legitimately inferred. *State v. Butler,* 269 N.C. 733, 153 S.E. 2d 477. The validity of the type of evidence here relied upon by the State was recognized in the case of *State v. Whiteside,* 204 N.C. 710, 169 S.E. 711. There, the defendants Whiteside and Cannon were charged with conspiracy to rob the Imperial Theatre in Asheville, North Carolina. Defendant Whiteside pleaded guilty; defendant Cannon pleaded not guilty. The State offered evidence which tended to show that defendant Whiteside was caught in the act of robbing the theatre, together with evidence that defendants had been acquainted for over a year and had "bummed" their way into Asheville on a train; that they both spent the night at the Salvation

Army and on the next day saw State's witness McDuffie. McDuffie testified that Cannon asked him if the Imperial was a good place to rob. Whiteside testified that Cannon had nothing to do with the robbery and that he did not even know Cannon. He further testified that State's witness McDuffie suggested to him that the Imperial Theatre was a good place to rob and that he (McDuffie) would help commit the robbery. The jury returned a verdict of guilty as to Cannon, who appealed. This Court, in holding that there was sufficient evidence to overrule defendant's motion as of nonsuit, stated:

> "Direct proof of the charge (conspiracy) is not essential, for such is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy. *S. v. Wrenn, supra.* When resorted to by adroit and crafty persons, the presence of a common design often becomes exceedingly difficult to detect. Indeed, the more skillful and cunning the accused, the less plainly defined are the badges which usually denote their real purpose. Under such conditions, the results accomplished, the divergence of those results from the course which would ordinarily be expected, the situation of the parties and their antecedent relations to each other, together with the surrounding circumstances, and the inferences legitimately deducible therefrom, furnish, in the absence of direct proof, and often in the teeth of positive testimony to the contrary, ample ground for concluding that a conspiracy exists. 5 RCL, 1088.

> "So, in the instant case, notwithstanding the positive testimony of Whiteside to the contrary, and the rather 'broken reed' upon which the State is compelled to rely, we think the evidence is sufficient to carry the case to the jury. Its credibility was for the twelve."

Thus, the situation of the parties and their relations to each other, together with the surrounding circumstances and the inferences deducible therefrom, may furnish ample proof of conspiracy even in the face of positive testimony to the contrary.

Defendant also contends that the case of *Woodworth v. The State,* 20 Tex. Cr. App., 375, supports her position. There, the witness Hunt testified that he intended to trap defendant Woodworth in the act of committing a burglary. He agreed with Hunt on a specific time when he would help him commit the burglary, but as soon as the plan was made Hunt dispatched a note advising the Sheriff of the plan so that he could be on hand at the proper time and place

and make the arrest. The Sheriff testified that he received the note and acted accordingly. This case is clearly distinguishable from the instant case because there the surrounding circumstances and the testimony of the witnesses, without contradiction or conflicting inferences, showed no unity of purpose to commit an unlawful act.

[8]   Defendant seriously argues that in addition to the statement of the alleged co-conspirators that they did not intend to harm her husband, certain acts, such as giving Deal a false identity, and the scattering of cigarette butts in the farmhouse to make it appear that they had lain in wait for her husband, tended to negate any union of purpose to do an unlawful act. In this connection the witness James, referring to Deal, testified: "He is a friend of mine and he is from out of town. I wanted to get somebody she didn't know . . . If it was someone around here that would kill him, she might have known about it." The witness' interest in further concealing the identity of a friend about to be asked to engage in an unlawful act is understandable. The other acts which defendant contends tend to negate the alleged conspiracy cannot be related to the night that James agreed to obtain someone to do "a little more than beat up or rough up" defendant's husband. One of the strongest indications of an unlawful agreement is found in the testimony of the witness Deal. Deal testified that *after* the telephone call from James (which must have been during the third meeting between James and defendant and in defendant's presence), James came to his home in Taylorsville and at that time stated to him that "He knowed an old gal in Statesville that we could get a little piece of money off of, and said that she wanted to get something done to her husband, and he said that she wanted to go further than roughing him up, and I said that I wouldn't do anything like that." This testimony permits a strong inference that up until the very moment that Deal refused to go along with the plan to murder defendant's husband, the alleged co-conspirator James still steadily pursued the unlawful object of obtaining someone to murder defendant's husband. Without attempting to review all of the indicia of conspiracy found in the State's evidence, we note that $2550 in cash was accepted by James and Deal from defendant, and James explained the purpose of the payment by testifying, "I received the money for doing just what we were talking about, to kill him." The testimony here referred to and the other facts found in the State's evidence are all colored by a delay of several months before either of the alleged co-conspirators talked with the police.

Surely, without the statement of the alleged co-conspirators that they never intended to harm defendant's husband, there was suffi-

cient evidence to raise an inference of intent to form a conspiracy between James and defendant — and probably between defendant, James and Deal. The denial of intent by both of the alleged conspirators created a conflict in the State's evidence which, upon a consideration of the evidence in a light most favorable to the State, presented a question for the jury.

The decision of the Court of Appeals is

Affirmed.