BRANCH BANKING AND TRUST COMPANY v. BANK OF WASHINGTON, WASHINGTON, NORTH CAROLINA.

(Filed 7 July, 1961.)

**1. Appeal and Error § 49—**

Upon waiver of jury trial, the court's findings of fact, if supported by competent evidence, are as conclusive as the verdict of a jury.

**2. Same—**

A finding of fact to which no exception is taken is presumed to be supported by competent evidence.

**3. Bills and Notes § 10—**

In regard to checks and in regard to drafts drawn on itself by the drawer, G.S. 25-143 and G.S. 25-144 apply, and the bank upon which the instrument is drawn has twenty-four hours after presentment in which to decide whether or not it will pay the instrument; but as to drafts drawn by a creditor against his debtor, these statutes do not apply, nor does G.S. 25-94 apply when the drawer does not have an account with the bank at which the instrument is payable.

**4. Same:   Banks and Banking § 9—**

Drafts drawn by a creditor against his debtor were deposited in the drawer's bank for collection, and sent by it, marked "no protest," to a second bank for collection, which second bank in turn sent them to a third bank in which the payor had an account. The third bank presented same to the payor, who neither paid the drafts nor accepted them, and the third bank held the drafts for more than a week before returning them to the second bank. *Held:* The payor's bank may not be held liable on the drafts on the theory that its delay in returning the unpaid drafts constituted a constructive acceptance of the drafts by it.

**5. Bills and Notes § 10—**

Where a creditor draws a draft on its debtor in another city, which draft is sent for collection through successive banks, it *is held* that prior to acceptance by the payor, the payee or holder of the bill must look to the drawer for his protection, since the liability of the  payor or drawee to the payee or holder does not accrue until he makes a valid acceptance to one who is entitled to enforce the engagement contained in the acceptance, in which event the acceptor engages to pay the instrument according to the tenor of his acceptance.

**6. Bills and Notes § 11—**

Where a draft has the words "NO PROTEST" stamped on it, the successive endorsers remain liable each to the prior endorser notwithstanding failure to make formal protest, presentment, or notice of dishonor. G.S. 25-118, G.S. 25-116, G.S. 25-117.

**7. Bills and Notes § 10:   Banks and Banking § 9—   Bank acting as agent for collection may not hold drawee's bank liable for negligence in failing to collect or return draft within reasonable time.**

The seller drew drafts for the purchase price of goods sold and de-

posited the drafts for collection in a bank in which he had an account. This bank endorsed the drafts to another bank for collection. The second bank in turn sent the drafts as a "cash item" to the bank in which the purchaser had its account. The purchaser neither accepted nor paid the drafts, and more than a week after its receipt of the drafts, the purchaser's bank returned them to the second bank upon the second bank's demand for action. The second bank returned the drafts to the seller's bank, but the seller's bank refused to reverse the credit on the ground of the delay in notice of nonpayment. The second bank acknowledged its liability to seller's bank for the amount of the drafts, and instituted action against the purchaser's bank. *Held:* The purchaser's bank may not be held liable by the second bank on the ground of negligence in failing to return the drafts promptly when they were not paid, since the second bank suffered no loss by any negligence in this respect for the reason that the second bank was not a drawee or acceptor and had the right to charge the drafts back to the seller's bank notwithstanding its admission to the contrary, and therefore it was not the real party in interest, G.S. 1-57, any loss suffered by the seller's bank on account of the negligence of the purchaser's bank not arising out of contract and not being assignable.

RODMAN, J., took no part in the consideration or decision of this case.

PARKER, J., dissenting.

HIGGINS, J., joins in dissent.

APPEAL by plaintiff from *Hooks, Special Judge,* September Civil Term, 1960, of WILSON.

Plaintiff and defendant are North Carolina banking corporations. Plaintiff's principal office is in Wilson, North Carolina, and defendant's principal office is in Washington, North Carolina.

Plaintiff's action is to recover the face amount of each of eight drafts, a total of $5,569.26, plus interest.

Plaintiff, in substance, alleged: (1) It is "the owner and holder for value" of said drafts. (2) Plaintiff forwarded each draft, "as a Cash Item," to defendant "for collection and return of proceeds." (3) Each draft "was attached to and formed a part of a Cash Letter which instructed the defendant to wire non-payment of items of $1,000.00 and over; to return promptly all unpaid items; and stating that the defendant would be held liable for loss in delay in returning papers." (4) Defendant failed (a) to collect said drafts, (b) to follow plaintiff's instructions, (c) to advise plaintiff of nonpayment, (d) to answer plaintiff's inquiries relating thereto. (5) Defendant held said drafts in its possession until plaintiff made specific demand therefor, "which resulted in their return on February 2, 1960, with the advice that payment was requested and payment was refused."

Plaintiff alleged defendant, by holding each of said drafts for more than twenty-four hours without receiving payment thereof or without

returning it to plaintiff, accepted such draft and is liable to plaintiff for the amount thereof.

Plaintiff alleged, alternatively, if it should be determined defendant did not accept the drafts, defendant is liable to plaintiff *for the amount thereof* as damages on account of defendant's negligence, alleging defendant knew or should have known Washington Hog Market was in serious financial difficulties.

Answering, defendant admitted plaintiff forwarded the drafts to it for collection and return of proceeds, accompanied by written instructions; that defendant, "in an effort to make collection thereof," held each draft more than twenty-four hours without receiving payment from the drawee; that defendant, after diligent effort, was unable to make collection from Washington Hog Market, the drawee; and that, "upon written instructions from plaintiff," it returned the drafts to plaintiff on February 2, 1960, advising plaintiff that payment had been requested and refused. Except as stated, defendant denied the material allegations of the complaint.

As a further answer and defense, defendant, in substance alleged: Plaintiff forwarded the drafts to defendant for collection from Washington Hog Market. Defendant presented the drafts to Washington Hog Market. Defendant handled the drafts in the same manner it had handled prior drafts of like nature forwarded to it by plaintiff for collection. Defendant, by holding said prior drafts for an equal or greater length of time, had collected from Washington Hog Market and remitted to plaintiff. Plaintiff, by acquiescing in this course of dealing, is estopped to maintain this action. If defendant was negligent, which it expressly denied, plaintiff has suffered no loss on account thereof.

The parties waived jury trial. G.S. 1-184. Both plaintiff and defendant offered evidence. The court, as provided by G.S. 1-185, entered judgment, based on findings of fact and conclusions of law set forth therein, which, omitting preliminary recitals, is set out below.

## "FINDINGS OF FACT

"(1) The Plaintiff, Branch Banking & Trust Company, is a North Carolina banking corporation with its main office in Wilson, North Carolina. The Defendant, Bank of Washington, is a North Carolina banking corporation with its main office in Washington, North Carolina, Beaufort County. For convenience the Plaintiff will hereafter be referred to as 'The Branch Bank.'

"(2) The Branch Bank is the holder for collection of eight drafts, drawn upon the Washington Hog Market by the H & N Hog Market payable to the order of the Bank of Halifax and en-

dorsed by it as will herein appear. Each of the eight drafts bear different dates and are in different sums. All eight drafts were drawn in the same manner and the following is an example of the drafts and was the first of the eight drafts:

"NO PROTEST
CUSTOMER'S DRAFT

### THE BANK OF HALIFAX

Weldon, N. C. ......... .....................12/23............................ 1959
Pay to the order of
       The Bank of Halifax .............................................$1006.51
One Thousand Six and 51/100 ........................................ Dollars
Value received and charge the same to account of

To WASHINGTON HOG MARKET)
     THE BANK OF WASHINGTON)     H & N HOG
     WASHINGTON, N. C.          )     MARKET
     Inv. 62722                      R.  Boyd  Robinson

(Reverse side of Draft)

Dec. 24, 1959 — Pay to the order of any BANK, BANKER OR TRUST CO. All Prior Endmts Guaranteed — The Bank of Halifax, Weldon, N. C. J. W. Brown, Cashier — 66-911. Pay to the order of any BANK, BANKER OR TRUST CO. Prior endorsements guaranteed. Dec. 28, 59 — Branch Banking & Trust Co., Wilson, N. C. 66-112.

"(3) Each of the eight drafts had attached to it an Invoice of H & N Hog Market, Weldon, N. C., showing the customer's name to be Washington Hog Market and each Invoice carried the same date and the amount as the draft to which it was attached. The following is an example of the Invoices attached to the drafts and was the Invoice attached to the draft set out in paragraph (2) above:

H & N Hog Market
Weldon, N. C.

Customer's
Order No. .......................................................... Date: 12/23   1959
Name      Washington Hog Market
Address      ...............................................

TRUST CO. *v.* BANK.

| Sold By Cash C.O.D. Charge | | | On Acct. Mdse. Retd. | |
|---|---|---|---|---|
| Quan. | Description | | Price | Amount |
| 15 | Shoats | 1774 | 11.00 | 195 14 |
| 2 | 140-160 | 284 | 11.50 | 32 89 |
| 25 | Tops | 3442 | 13.00 | 707 46 |
| 1 | 240-270 | 268 | 11.50 | 30 82 |
| 1 | Sow | 216 | 9.50 | 20 52 |
| 1 | 160-180 | 164 | 12.00 | 19 68 |
| | | | | 1006 51 |

*Paid out*

(Pay to the order —
(Bank, Banker or —
(Prior Endorsements —
(        Dec. 28
(Branch Banking & T
(66-112 Wilson, N. C.

ALL claims and returned goods MUST be accompanied by this bill.

62722                    Recd. by _____

"(4) In addition to the draft set out in paragraph (2) above, the Branch Bank is the holder for collection of the following drafts, all of which followed the same form as set out in paragraph (2) above, bearing the same endorsement on the reverse side, with the same style of Invoices attached as set out above, with the exception of the dates and amounts which are stated hereafter:

| | |
|---|---|
| Draft No. 2: January 2, 1959 (60) in the sum of | $1063 42 |
| Draft No. 3: January 11, 1960 in the sum of | 732 67 |
| Draft No. 4: January 14, 1960 in the sum of | 197 23 |
| Draft No. 5: January 15, 1960 in the sum of | 889 55 |
| Draft No. 6: January 18, 1960 in the sum of | 1085 59 |
| Draft No. 7: January 21, 1960 in the sum of | 384 43 |
| Draft No. 8: January 23, 1960 in the sum of | 209 86 |

"(5) On the day that each of the above drafts were dated or the day following said date, H & N Hog Market deposited said drafts with the payee, the Bank of Halifax subject to the following contract or agreement: 'In receiving items for deposit or collection, this Bank acts only as depositor's collecting agent and assumes no responsibility beyond the exercise of due care. All items are credited subject to final payment in cash or solvent credits. This Bank will not be liable for default or negligence of its duly selected correspondents nor for losses in transit, and each correspondent so selected shall not be liable except for its own negligence. This bank or its correspondents may send items, directly or indirectly, to any bank including the payor, and accept its draft or credit as conditional payment in lieu of cash; it may charge back any item at any time before final payment, whether returned or not, also any item drawn on this Bank not good at close of business on day deposited.'

"(6) After receiving each of the drafts, the Bank of Halifax immediately forwarded the same to the Branch Bank, after endorsing each of said drafts as indicated in finding of fact #2 above. Each of said drafts was forwarded to the Branch Bank with a letter of transmittal from the Bank of Halifax containing the following provision: 'We enclose the following items for collection and remittance — Credit:' The drafts were forwarded by the Bank of Halifax to the Branch Bank subject to the following agreement which had been executed between these two Banks:

'In receiving items for deposit or collection, the Branch Banking & Trust Company acts only as depositor's collecting agent, until actual final payment in cash or solvent credits; and when such items are credited to depositor's account it is with the understanding that same is subject to final payment and that any such items may be charged back at any time before final payment, and that until final payment, the Branch Banking & Trust Company may refuse payment of any check or draft drawn against such uncollected items. The Branch Banking & Trust Company's liability is limited to the exercise of due care. Unless instructions to the contrary are given when items are deposited, the Branch Banking & Trust Company or its correspondents, may send same direct to the Banks on which they are drawn, or through intermediate banks, and may accept drafts or credits as conditional payment, in lieu of cash; and the Branch Banking & Trust Company will not be held liable for failure, default or neglect of any such payor bank or of

any duly selected correspondent, or for losses in transit; and no such correspondent shall be held liable except for its own negligence. Items in Wilson are credited subject to final payment through the Wilson Banks and the Branch Banking & Trust Company may charge back any item drawn on itself which is not good at close of business on day of deposit.'

"The Bank of Halifax was given credit for the drafts upon their receipt by the Branch Bank. The Branch Bank received each of the drafts from the Bank of Halifax the day following the forwarding of the same.

"(7) The Branch Bank forwarded said drafts to the Bank of Washington with its letter of transmittal on a form containing the following provisions:

'We enclose for collection and return of proceeds as listed below. Deliver documents only on payment. Correspondents will be held liable for loss resulting from delay in returning papers.

'Return promptly all unpaid items.
Please report by date of letter.
Wire non-payment of items of $1,000.00 and over.
Do not protest items $1,000.00 or under, or those bearing this stamp or similar authority of a preceding endorser.'

On the above form the Branch Bank typed the words 'Cash draft,' followed by the amount of each of said drafts.

"(8) When the drafts were received by the Bank of Washington, in accordance with its general custom in handling drafts of this nature, they were treated as collection items. The Bank of Washington had no authority from Washington Hog Market to honor the said drafts and each of them had to be presented to the Washington Hog Market for acceptance before the Bank of Washington had authority to pay the same. From the face of the drafts and the Invoices attached thereto, the Court finds that the drawer was H & N Hog Market, the seller of the hogs, upon Washington Hog Market, the drawee, the buyer of the hogs represented by each draft and Invoice.

"(9) Upon receipt of each of the drafts by the Bank of Washington, it was presented to Washington Hog Market for acceptance, and for payment thereof. The Washington Hog Market did not pay said drafts when called upon for payment, nor did it refuse to pay the same. The Bank of Washington held all of the eight drafts until February 2, 1960. The Bank of Washington was unable to collect any of the said drafts.

"(10) In the meantime the Branch Bank sent to the Bank of Washington three 'Tracers' on a form containing the following:

'Branch Banking & Trust Company
Wilson, N. C.

Please report on our: Cash Letter
                                            Collections

Date

Amount

1/13/60 Cash draft Washington Hog Market
$732.67

Please Advise
Branch Banking & Trust Company.'

"The Branch Bank did not receive any response from the Bank of Washington as to any of its letters of transmittal or its 'Tracers.'

"On February 1, 1960, the Assistant Cashier of the Branch Bank addressed a letter to the Cashier of the Bank of Washington which read in part: 'According to our records our cash letters to you consisting of drafts drawn on Washington Hog Market is *(sic)* still unpaid:

"'We would appreciate you presenting these drafts for payment and if not paid return to us so we might clear our records.' This letter was received by the Bank of Washington on February 2, 1960, and on that same date the Bank of Washington returned to the Branch Bank the drafts in question.

"(11) On each occasion when a 'Tracer' was received from the Branch Bank by the Bank of Washington, the defendant again promptly called upon Washington Hog Market for payment of the drafts and the same were not paid nor did the said Hog Market refuse to pay the same.

"(12) On February 5, 1960, the Bank of Washington again received all of said drafts from the Branch Bank accompanied by a written request reading in part as follows: 'We enclose for collection and return of proceeds as listed below,' and then followed a listing by amounts of the eight drafts referred to in the complaint. The defendant Bank again called upon the Washington Hog Market for payment of the drafts, and being unable to collect the same, finally returned the same to the plaintiff on February 17, 1960.

"(13) For several months prior to the receipt of the drafts in question, the Bank of Washington had received from the Branch Bank numerous drafts, such as the ones in question, on Washington Hog Market, some of which were drawn by H & N Hog

Market and some by other livestock dealers. Upon receipt of such drafts the Bank of Washington promptly called upon Washington Hog Market for payment and it was necessary for the Bank of Washington to hold such drafts for periods of time as long as twenty days in order to make collection and remit the same to the Branch Bank.

"(14) During the period from December 28, 1959, through February 2, 1960, the daily bank balance of Washington Hog Market, Inc., with the Bank of Washington ranged from a maximum deposit of $36,085.76 to as low as an overdraft of $15,186.95 on one particular day. Also during the period from December 28, 1959, through January 29, 1960, the Bank of Washington had received and was holding daily for collection drafts drawn by various livestock markets upon the Washington Hog Market exceeding $100,000.00. Upon calling upon Washington Hog Market for payment of each of said drafts, the Washington Hog Market would select the draft or drafts which it was willing to accept and pay at that particular time. The Bank of Washington promptly remitted payments on the drafts which were accepted and paid by Washington Hog Market.

"(15) Washington Hog Market, Inc. is now in bankruptcy.

"(16) At all times throughout the course of dealing with these drafts from December 28, 1959, through February 2, 1960, the Washington Hog Market, Inc. was insolvent. This fact was not known to the Bank of Washington at the time it received said drafts.

"(17) Following the return of the drafts in question to the Branch Bank by the Bank of Washington, the Branch Bank charged back to the Bank of Halifax the face amount of all eight drafts and returned the said drafts to the Bank of Halifax. The Bank of Halifax refused to accept the return of the drafts, and in turn forwarded the same back to the Branch Bank, which is now the holder of the same.

"(18) The Bank of Washington acted at all times in good faith in its efforts to collect the drafts in question. By reason of the prior course of dealings between plaintiff and defendant in the handling of these and other similar drafts for collection from this Hog Market, the Bank of Washington did not convert these drafts by failing to return them promptly to the Branch Bank.

"(19) The Branch Bank was not damaged by the conduct of the Bank of Washington in attempting to collect the drafts for the reason that Branch Bank has offered no evidence tending to

establish that the drafts would have been paid except for the conduct of defendant Bank.

"(20) The Branch Bank was not the owner of said drafts, but holder thereof as an agent for collection.

"Upon the foregoing findings of fact, the Court reaches the following:

### "*CONCLUSIONS OF LAW*

"(1) The Washington Hog Market and not the Bank of Washington was the drawee in all the drafts involved herein.

"(2) The Bank of Washington did not accept the said drafts.

"(3) The Branch Bank has not been damaged by the conduct of the Bank of Washington in attempting to collect the drafts.

"(4) The Branch Bank is not the real party in interest and not entitled to maintain this action;

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the plaintiff's action be, and the same hereby is dismissed, and the costs taxed against the plaintiff."

Plaintiff excepted (1) to designated findings of fact and conclusions of law made by the court, (2) to the court's refusal to make the findings of fact and conclusions of law requested by plaintiff, (3) to the judgment, and appealed.

*Carr & Gibbons for plaintiff, appellant.*
*Finch, Narron, Holdford & Holdford and Rodman & Rodman for defendant, appellee.*

BOBBITT, J. Upon waiver of jury trial, the court's findings of fact, if supported by competent evidence, are as conclusive as the verdict of a jury. Moreover, a finding of fact to which no exception is taken is presumed to be supported by competent evidence. Constitution of North Carolina, Article IV, Section 13; *Goldsboro v. R. R.*, 246 N.C. 101, 107, 97 S.E. 2d 486, and cases cited. Plaintiff's assignments of error must be considered in the light of these well established legal principles.

Plaintiff assigns as error the court's finding of fact and legal conclusion that Washington Hog Market, not defendant, was the drawee in the drafts, and the court's legal conclusion that defendant did not accept the drafts. Plaintiff contends defendant was in fact and in law the drawee, accepted them, actually or constructively, and is obligated *on the drafts* to plaintiff as owner and holder thereof.

Under G.S. 25-143, "*(t)he drawee* is allowed twenty-four hours

after presentment in which to decide whether or not he will accept the bill." (Our italics) Under G.S. 25-144, "(w)here *a drawee* to whom a bill is delivered for acceptance destroys the same or refuses within twenty-four hours after such delivery, or within such other period as the holder may allow, to return the bill accepted or nonaccepted to the holder, he will be deemed to have accepted the same." (Our italics) Plaintiff contends defendant's failure to pay or return the drafts within twenty-four hours after it received them constituted acceptance of the drafts by defendant. This contention assumes defendant was the drawee.

Washington Hog Market purchased hogs from H & N Hog Market. H & N Hog Market asserted Washington Hog Market was indebted to it, for hogs listed on the invoices, in the amounts for which the drafts were drawn.

H & N Hog Market had no account with defendant. Defendant was not indebted or otherwise obligated to it. Washington Hog Market, which had an account with defendant, had not authorized defendant to charge these drafts or any drafts to its account.

A bill of exchange is defined as "an unconditional order in writing, addressed by one person to another, signed by the person giving it, requiring the person to whom it is addressed to pay on demand or at a fixed or determinable future time a sum certain in money to order or to bearer." G.S. 25-133. Absent evidence of special arrangements, the reasonable inference is that a draft is addressed to a party obligated to the drawer to make such payment.

A check is defined as "a bill of exchange drawn on a bank payable on demand." G.S. 25-192. It is an order to the bank on which it is drawn to pay the amount thereof and charge it to the drawer's account. In respect of a check, the bank on which it is drawn is the drawee; and, when presented to the drawee, the provisions of G.S. 25-143 apply.

G.S. 25-94, to which plaintiff directs our attention, provides: "Where the instrument is made payable at a bank it is equivalent to an order to the bank to pay the same for the account of the principal debtor thereon." But this provision contemplates a situation where the drawer of the instrument has or purports to have an account with the bank at which the instrument is payable.

To support its said contention, plaintiff cites *Mt. Vernon Nat. Bank v. Canby State Bank* (Oregon), 276 P. 262, 63 A.L.R. 1133. In that case, the drawer drew a draft *on itself,* payable at a bank with which the drawer had an account. The opinion states: "Although in form a draft, it has all the essential elements of a check." Again: "When *the drawer* made this check payable at the Canby State Bank, it was

equivalent to an order on that bank to pay the same *and charge to its account."* (Our italics) Decisions relating (1) to checks, or (2) to drafts where the drawer draws the draft *on itself,* payable by or at a bank *where the drawer has an account,* where the bank, upon payment, can charge the amount thereof to the account of its depositor, are not relevant to the present factual situation.

It seems clear all parties understood the drafts were forwarded to defendant as collecting agent, not as drawee. The Vice-President of the Bank of Halifax testified: "I knew that these drafts were being drawn upon the Washington Hog Market. I knew that the Washington Hog Market had to accept and pay these drafts." Moreover, plaintiff forwarded the drafts to defendant "for collection and return of proceeds" and, by letter of February 1, 1960, requested defendant to present "these drafts for payment and if not paid return to us so we might clear our records."

Plaintiff contends, apart from G.S. 25-143 and G.S. 25-144, defendant's alleged negligence in failing to return the drafts promptly to plaintiff or notify plaintiff of their nonpayment by Washington Hog Market, constituted a constructive acceptance by defendant of the drafts. The significance of defendant's negligence, if any, is discussed below. Presently, it is sufficient to say: If defendant was not the drawee, it cannot be held liable *on the drafts* on the theory that it constructively accepted said drafts as drawee. The court's legal conclusion that defendant "did not accept the said drafts," assigned as error by plaintiff, was correct.

A drawee (unless also the drawer) becomes liable for the payment of a draft only upon his acceptance thereof. G.S. 25-68. "Until the instrument is accepted, the payee or holder of the bill must look to the drawer for his protection. The liability of the drawee to the payee or holder accrues when he makes a valid acceptance of the bill and when it is in the possession or is delivered to one who is entitled to enforce the engagement contained in the acceptance. The legal intendment of the acceptance is that the acceptor engages to pay the instrument according, but only according, to the tenor of his acceptance. It is, in short, a promise to pay." 8 Am. Jur., Bills and Notes § 524; 10 C.J.S., Bills and Notes § 171; G.S. 25-67.

Washington Hog Market, when notified by defendant of its receipt thereof for collection, did not pay or otherwise accept the drafts. Whatever its indebtedness or liability to H & N Hog Market for purchase price for hogs, Washington Hog Market is not liable to anybody *on the drafts* absent its acceptance thereof.

Under the circumstances, the evidence was amply sufficient to support the court's findings of fact and legal conclusions that the drawee

in each of these drafts was Washington Hog Market; that the drafts were forwarded to defendant for collection from Washington Hog Market, not for acceptance by defendant as drawee; and that defendant did not *accept* the drafts and is not liable *thereon.* In a strikingly similar factual situation, it was so held by the Supreme Court of Texas in *Tyler Bank & Trust Company v. Saunders,* 317 S.W. 2d 37.

Having reached the conclusion defendant is not liable to plaintiff *on the drafts,* we consider now whether defendant is liable to plaintiff *for the amount* of the drafts as damages caused by the alleged negligence of defendant. In this connection, it is noted: While the court found defendant acted in good faith in its efforts to collect the drafts, to which plaintiff excepted, no finding of fact was made as to whether defendant was negligent. Decision was based on a finding of fact and legal conclusions, to which plaintiff excepted, (1) that plaintiff had not been damaged by defendant's conduct, and (2) that plaintiff is not the real party in interest and therefore cannot maintain this action.

The author of the Annotation in 19 A.L.R. 555, *556,* citing decisions from many jurisdictions, says: "Despite expressions to be found in some cases to the effect that the measure of damages for breach of duty by a bank in respect to the collection of commercial paper is the face of the paper involved, the true rule, supported by the overwhelming weight of authority, is that the damages are measured by the actual loss suffered by the owner of the paper, in consequence of the negligence or misconduct of the bank; at least, in the absence of bad faith, or positive wrongdoing, or failure to return the paper." In support of this statement, these North Carolina decisions are cited: *Stowe v. Bank,* 14 N.C. 408; *Bank v. Kenan,* 76 N.C. 340; *Bank v. Trust Co.,* 172 N.C. 344, 90 S.E. 302, and on subsequent appeal, *Bank v. Trust Co.,* 177 N.C. 254, 98 S.E. 595.

We think the evidence amply sufficient to support the court's finding of fact that defendant acted in good faith in its efforts to collect the drafts. There is no evidence of positive wrongdoing on the part of defendant. Defendant returned the drafts to plaintiff immediately when requested to do so. The drafts were presented by defendant to Washington Hog Market. Negligence, if any, on the part of defendant, consists in the failure to notify plaintiff promptly of its inability to collect the drafts from Washington Hog Market.

H & N Hog Market was a regular customer of the Bank of Halifax. When each draft was drawn, H & N Hog Market had nothing more than a creditor's claim against Washington Hog Market. The draft procedure was adopted as a method of collecting the debt.

When the drafts were deposited in the Bank of Halifax, the account

of H & N Hog Market was credited with the amount thereof subject to the terms and provisions of the agreement set forth in Finding of Fact #5. It was agreed the Bank of Halifax was to act "only as depositor's collecting agent" and assumed "no responsibility beyond the exercise of due care." It was further agreed: "All items are credited subject to final payment in cash or solvent credits. This Bank will not be liable for default or negligence of its duly selected correspondents nor for losses in transit, and each correspondent so selected shall not be liable except for its own negligence."

The Bank of Halifax, a regular customer of plaintiff, stamped its endorsement on the drafts and promptly forwarded them to plaintiff. Upon receipt, plaintiff credited the account of the Bank of Halifax with the amount thereof subject to the terms and provisions of the agreement set forth in Finding of Fact #6. It was agreed plaintiff was to act "only as depositor's collecting agent, until actual final payment in cash or solvent credits; and when such items are credited to. depositor's account it is with the understanding that same is subject to final payment and that any such items may be charged back at any time before final payment, and that until final payment, the Branch Banking & Trust Company may refuse payment of any check or draft drawn against such uncollected items." It was further agreed: "Branch Banking & Trust Company's liability is limited to the exercise of due care." Again: ". . . Branch Banking & Trust Company will not be held liable for failure, default or neglect of any such payor bank or of any duly selected correspondent, or for losses in transit." Plaintiff promptly forwarded the drafts to defendant "for collection and return of proceeds."

There is no evidence of negligence on the part of the Bank of Halifax. Nor is there evidence of negligence on the part of plaintiff. No reason appears why plaintiff was not legally entitled to charge the amount of these uncollected and unaccepted drafts to the Bank of Halifax, or why the Bank of Halifax, in turn, was not legally entitled to charge the amount thereof to H & N Hog Market. Indeed, they were entitled to do so under the express terms and conditions of the agreements under which credit had been given. The credits given "were purely temporary and conditional." *American Barrel Co.· v. Commissioner of Banks* (Mass.), 195 N.E. 335.

Since the drafts were neither paid nor accepted by the drawee, the only persons liable *thereon* were these: Bank of Halifax, as endorser, was liable thereon to plaintiff; and, in turn, H & N Hog Market, the drawer, was liable thereon to the Bank of Halifax. Apart from the express agreements under which the drafts were deposited and credited, the words "NO.·PROTEST," were plainly printed on each draft. Thus,

the drawer (H & N Hog Market) and initial endorser (Bank of Halifax) remained liable thereon notwithstanding a failure to make formal protest, presentment or notice of dishonor. G.S. 25-118; G.S. 25-116; G.S. 25-117; *Shaw v. McNeill,* 95 N.C. 535; *Pearson v. Westbrook,* 206 N.C. 910, 174 S.E. 291; Daniel on Negotiable Instruments, Seventh Edition, Vol. II, § 1262.

Plaintiff concedes it received the drafts originally *as agent for collection* and was not, originally, the real party in interest under G.S. 1-57. *Bank v. Rochamora,* 193 N.C. 1, 136 S.E. 259; *Worth Co. v. Feed Co.,* 172 N.C. 335, 90 S.E. 295; *Bank v. Exum,* 163 N.C. 199, 79 S.E. 498. It contends it became the owner and holder of the drafts and the real party in interest by reason of its admission of liability to the Bank of Halifax under the circumstances set forth below.

On February 1, 1960, plaintiff requested defendant to present "these (listed) drafts for payment and if not paid return to us so we might clear our records." On February 2, 1960, defendant, upon receipt of plaintiff's letter, returned the drafts to plaintiff. Thereupon, as plaintiff's President testified, plaintiff "undertook to charge them back to the Bank of Halifax." Again: "The Bank of Halifax refused to accept the charge." The Bank of Halifax returned the drafts to plaintiff. On February 5, 1960, plaintiff's Vice-President wrote defendant, addressing the letter to defendant's Cashier. This letter, in part, reads: "Our depositor has refused to accept these items, due to the length of time they were held by you. Please forward us your check less your usual charge in payment of these items." Plaintiff enclosed with said letter a "Letter of Transmittal" dated February 5, 1960, on which the drafts were listed, in which it was stated the drafts were enclosed "for collection and return of proceeds."

Plaintiff made its first demand on defendant for payment after plaintiff's customer, Bank of Halifax, "refused to permit us to return the drafts . . . on account of the passage of time." "(S)ome time later," so plaintiff's President testified, when asked "a point-blank question," plaintiff "admitted its liability on the drafts to the Bank of Halifax." This stipulation appears in the case on appeal: ". . . the Bank of Halifax declined to accept these items to be charged back to its account by the Branch Banking and Trust Company on the ground of the delay involved." This statement of plaintiff's President is of interest: "The Branch Bank does not assert any claim against the Bank of Halifax or the drawer of these drafts *at this time.*" (Our italics)

It is understandable that plaintiff would be disposed to acquiesce in the contention of the Bank of Halifax, its customer, and the Bank of Halifax would be disposed to act in the interests of H & N Hog Market, its customer. However, nothing in the record indicates the

collected balance in the account of the Bank of Halifax with plaintiff was less than the amount of the drafts. Nor does it appear that the collected balance in the account of H & N Hog Market with the Bank of Halifax was less than the amount of the drafts. The Vice-President of the Bank of Halifax testified: "I had no suspicions about its (H & N Hog Market) financial condition. They were regular customers of our bank. They were solvent at the time as far as I know. We did not call them or attempt to charge these items back to our customers, the H & N Hog Market."

When plaintiff "admitted its liability" to the Bank of Halifax, absolutely or tentatively, it admitted a liability that did not exist. Its gratuitous admission of liability conferred no legal rights on plaintiff. The Bank of Halifax had no legal right to maintain an action against defendant *on the drafts*. Any right of action the Bank of Halifax had against defendant was for such loss, if any, *as it suffered* on account of defendant's negligence. Such an action, "not arising out of contract," was not assignable. G.S. 1-57.

Plaintiff's legal rights were neither increased nor decreased by reason of its said admission of liability. Any right of action it had or now has against defendant was and is for such loss, if any, *as it suffered* on account of defendant's negligence. No such loss is alleged or shown. This action is by plaintiff, as the alleged owner and holder of the drafts, to recover the amount thereof. Loss resulting from plaintiff's gratuitous admission of nonexistent liability to the Bank of Halifax cannot be considered a loss proximately caused by defendant's negligence.

Each of the cases cited by plaintiff is factually distinguishable. It is deemed sufficient to consider in detail only *Trust Co. v. Bank*, 166 N.C. 112, 81 S.E. 1074, and on subsequent appeal, *Trust Co. v. Bank*, 167 N.C. 260, 83 S.E. 474, referred to in plaintiff's brief as the leading case and as setting forth the grounds on which "plaintiff framed its complaint."

In *Trust Co. v. Bank, supra* (166 N.C. 112), the plaintiff appealed from a judgment of nonsuit entered at the close of plaintiff's evidence. The judgment was reversed and the cause remanded for trial. As disclosed by plaintiff's evidence, the factual situation was as follows: (1) The action involved *a check* drawn on defendant (drawee) by Cone, its depositor. (2) The payee, Latham, Alexander & Co., was a customer of plaintiff. It deposited the check with plaintiff and was given immediate credit. (3) In accordance with their prior agreement, the payee drew out by his checks on plaintiff the amount of said deposit. (4) Defendant, after receipt of said check, did not pay it but held it for two days and then returned it, indicating it had been protested

for nonpayment, notwithstanding its customer had funds to his credit more than sufficient to pay the check. (5) At or about the time defendant received the check, it also received word its depositor had attempted to commit suicide; and thereupon, having ascertained its depositor's financial condition, defendant charged against its depositor's account the sum of $10,000.00 to cover a note in that amount due by its depositor to defendant. (6) Meanwhile, plaintiff's depositor went into bankruptcy. It had no funds on deposit with plaintiff out of which the check could be realized. (7) Defendant's depositor, the drawer of the check, was also insolvent. It is noted: *Plaintiff's depositor* had become bankrupt. Hence, plaintiff suffered actual loss because it could not charge back or otherwise collect from its depositor. None of the forwarding banks, which occupied the status of plaintiff herein, was a party to the action.

Plaintiff stresses these evidential facts: The drafts were forwarded by the Bank of Halifax to plaintiff along with numerous checks, "for collection and remittance—Credit." When forwarded by plaintiff to defendant, the drafts were designated Cash Drafts on the Letters of Transmittal. Plaintiff contends the drafts were forwarded in each instance as *cash items*.

Checks, when presented to a drawee bank for payment, are subject to the twenty-four hour rule prescribed by G.S. 25-143 and G.S. 25-144; but these drafts, forwarded to defendant for collection by it from Washington Hog Market, were not subject to the provisions of G.S. 25-143 and G.S. 25-144. It is noted that a draft may be payable "on demand or at a fixed or determinable future time." G.S. 25-133. The notation, "Cash Draft," indicates it is payable on demand.

Plaintiff's President testified: *"In our bank* cash items mean checks and other credit instruments that are received for immediate credit." (Our italics) He testified further: *"Our bank* had forwarded various other drafts prior to these drafts to the Bank of Washington drawn on the Washington Hog Market. The Bank of Washington would make remittance to us by sending us a bank draft. Until we received that bank draft we couldn't know whether the drafts had been paid by the Washington Hog Market or not." (Our italics)

Prior drafts, all of which were ultimately collected by defendant and remitted to plaintiff, had been held by defendant for various lengths of time before collected by defendant. In October and November of 1959, eight such drafts had been held by defendant, pending collection thereof from Washington Hog Market, for periods of time varying from fourteen to twenty days. Although plaintiff, by letter of February 10, 1960, after the present controversy had arisen, demanded that defendant pay to it the amount of the eight drafts now

in controversy "plus 6% interest for the length of time they have been held by you," nothing appears to indicate plaintiff ever called on defendant for the payment of 6% interest on prior (collected) drafts for the length of time they were held by defendant pending collection.

The term "cash item" is not defined by statute. If it has a *precise* meaning in banking circles, the evidence does not disclose such meaning. In our view, the evidence tending to identify these drafts by the label, "cash item," is competent for consideration, along with all other circumstances, as bearing upon whether defendant was negligent, in a properly constituted action by a party in interest, namely, a party who has suffered actual loss on account of the alleged negligence of defendant. Plaintiff having failed to establish it has suffered actual loss on account of the alleged negligence of defendant, such evidence, whatever its probative value, is not pertinent to present decision.

Plaintiff suggests defendant's negligence caused H & N Hog Market to sell and deliver hogs to Washington Hog Market and thereby suffer loss on account of the alleged negligence of defendant. We are not now concerned with whether H & N Hog Market has a cause of action against defendant grounded on negligence. Suffice to say, no person connected with H & N Hog Market testified. There is no evidence as to the time, terms or other circumstances of the sales by H & N Hog Market to Washington Hog Market. Nor is there evidence as to dealings, if any, between H & N Hog Market and Washington Hog Market during the time defendant held the drafts or subsequent thereto.

In *Grant County Deposit Bank v. McCampbell* (C.C. 6th), 194 F. 2d 469, 31 A.L.R. 2d 909, cited by plaintiff, similar drafts were considered. But there the action was by the *drawer of the drafts,* not by a forwarding bank, against the collecting bank and the drawee. This would seem to be the proper procedure. In such action, the facts as to the dealings and relationships between the drawer and the drawee would be fully disclosed.

We do not hold the evidence insufficient to support a finding of fact that defendant was negligent. As to an action grounded on negligence, decision here, as in the court below, is on the ground plaintiff has failed to show it has suffered actual loss on account of defendant's conduct, its gratuitous admission of liability to the Bank of Halifax under the circumstances here disclosed being insufficient to establish a loss proximately caused by defendant's negligence.

The conclusions reached require that the judgment of the court below be, and it is, affirmed.

Affirmed.

RODMAN, J., took no part in the consideration or decision of this case.

PARKER, J., dissenting. Branch Banking and Trust Company, here-after called Branch Bank, received the drafts from the Bank of Halifax originally as an agent for collection. As such it was not originally the real party in interest under G.S. 1-57, and nothing else appearing would not be entitled to maintain this action. *Bank v. Rochamora,* 193 N.C. 1, 136 S.E. 259; *Worth v. Feed Company,* 172 N.C. 335, 90 S.E. 295; *Bank v. Exum,* 163 N.C. 199, 79 S.E. 498.

The 6th finding of fact in part is: "The Bank of Halifax was given credit for the drafts upon their receipt by the Branch Bank."

According to the agreement between Branch Bank and the Bank of Halifax, set forth in the 6th finding of fact, when the Branch Bank gave the Bank of Halifax credit for the drafts upon their receipt, it had the right of timely charge back if the drafts were not paid. Un-questionably, Branch Bank expected to receive prompt payment with-in twenty-four hours from the Bank of Washington or timely notice from the Bank of Washington of nonpayment of the drafts, which would have enabled it to reverse its credit to the Bank of Halifax, and charge the items back. According to the agreement between them, Branch Bank's liability to the Bank of Halifax is limited to the exer-cise of due care.

This is the 17th finding of fact: "Following the return of the drafts in question to the Branch Bank by the Bank of Washington, the Branch Bank charged back to the Bank of Halifax the face amount of all eight drafts and returned the said drafts to the Bank of Halifax. The Bank of Halifax refused to accept the return of the drafts, and in turn forwarded the same back to the Branch Bank, which is now the holder of the same."

The parties stipulated in a pre-trial conference as follows: "It is stipulated that the Bank of Halifax declined to accept these items to be charged back to its account by the Branch Banking and Trust Company on the ground of the delay involved."

J. E. Paschall, president of Branch Bank, testified as follows: "The Branch Banking and Trust Company did not notify the Bank of Halifax of the nonpayment of these items prior to their return by the Bank of Washington. The Branch Bank did not notify the Bank of Halifax because they were considered as paid. I know why we did not notify the Bank of Halifax. We did not notify them because we were looking to the Bank of Washington for payment. We were look-ing to the Bank of Washington for payment because of the lapse of time. The lapse of time was 24 hours plus mailing time and, after

that, we considered them paid. When these drafts were returned by the Bank of Washington to the Branch Banking and Trust Company, the Branch Banking and Trust Company undertook to charge them back to the Bank of Halifax. The Bank of Halifax refused to accept the charge. The Branch Bank admitted its liability on the drafts to the Bank of Halifax. This admission of liability was when I was asked a pointblank question. The conversation that took place was some time later. I don't remember just exactly when, but we admitted it as soon as we found out they did not accept them. The Bank of Halifax refused to permit us to return the drafts as soon as the drafts got back to them on account of the passage of time. They claim that the drafts were paid or they thought they were paid. Of course, we knew that they were correct. We had received the drafts back from the Bank of Washington before the Bank of Halifax made that decision because they thought they were paid. The Branch Bank does not assert any claim against the Bank of Halifax or the drawer of these drafts at this time."

Fletcher H. Gregory, Jr., vice president of the Bank of Halifax, testified: "On February 2, 1960, the Branch Bank undertook to charge these drafts to our account. They returned the drafts to us. We did not accept the drafts. We did not accept the drafts *(sic)*. In the absence of notice to the contrary, we considered that the transactions were closed and that the drafts had been finally paid and that we had final credit at the Branch. We had entered into a deposit arrangement at the Branch Banking and Trust Company under the terms of which items were deposited subject to final payment. We did not accept this charge back under the terms of that arrangement because we considered that final payment had been made. When the Branch Bank returned these drafts to the Bank of Halifax, we did not undertake to charge them back to the account of the H & N Hog Market. We did not call on the H & N Hog Market for all of them. The Branch Banking and Trust Company has admitted liability to the Bank of Halifax on these drafts. The Branch Banking and Trust Company paid the Bank of Halifax for these drafts."

Appellant states in its brief: "However it be viewed, whether under the deposit agreement or under the terms of the Negotiable Instruments Act, the plaintiff lost its right to charge the drafts back to its forwarder on account of the lapse of time. Thereupon, it admitted its liability."

The majority opinion states: "No reason appears why plaintiff was not legally entitled to charge the amount of these uncollected and unaccepted drafts to the Bank of Halifax or why the Bank of Halifax, in turn, was not legally entitled to charge the amount thereof to H

& N Hog Market. Indeed, they were entitled to do so under the express terms and conditions of the agreements under which credit had been given. The credits given 'were purely temporary and conditional.' " The majority opinion cites in support of the above statement *American Barrel Co. v. Commissioner of Banks,* 290 Mass. 174, 195 N.E. 335. As I read this case, it does not support the above statement. The facts in the *Massachusetts* case are entirely different, in that the vital point here of the long delay by Branch Bank to notify the Bank of Halifax of the nonpayment of the drafts was not presented in the *Massachusetts* case, and that opinion doesn't even mention such a point.

The majority opinion further states: "When plaintiff 'admitted its liability' to the Bank of Halifax, absolutely or tentatively, it admitted a liability that did not exist. Its gratuitous admission of liability conferred no legal rights on plaintiff."

I do not agree with the two above statements quoted from the majority opinion. In my opinion, Branch Bank's admission of liability to the Bank of Halifax is based upon the fact that Branch Bank realized it had breached its agreement with the Bank of Halifax to exercise due care, which exercise of due care means it was the positive legal duty of Branch Bank to notify in apt time the Bank of Halifax of the nonpayment of these drafts, so that the Bank of Halifax could protect itself against H & N Hog Market, to whom it is reasonable to infer from the findings of fact the Bank of Halifax had paid the face value of the drafts after it had not heard of their nonpayment for such a long time from Branch Bank.

The drafts here constitute commercial paper in the strictest sense, and must be regarded as favored instruments, as well on account of their negotiable quality as their universal convenience in mercantile affairs. *Goodman v. Simonds,* 20 How. (U.S.) 343, 15 L. Ed. 934, 941. The office of these drafts was to collect for the drawer, H & N Hog Market, Weldon, North Carolina, from the drawee, Washington Hog Market, at the Bank of Washington, Washington, North Carolina, money to which the former may be entitled. 7 Am. Jur., Bills and Notes, Section 6 — Bills of Exchange and Drafts.

These drafts are cash items. "Cash items, in banking phraseology, mean notes, checks, or memoranda in the paying teller's possession at the close of a day's work which he, for the time being, treats as cash in order to make his books balance." *Green v. Farmers & Merchants State Bank,* Tex. Civ. App., 100 S.W. 2d 132, 138. To the same effect, *La Monte v. Mott,* 93 N.J. Eq. 255, 116 A. 269, affirming 93 N.J. Eq. 229, 107 A. 462, 469.

This is the court's 7th finding of fact: "The Branch Bank forwarded

said drafts to the Bank of Washington with its letter of transmittal on a form containing the following provisions: 'We enclose for collection and return of proceeds as listed below. Deliver documents only on payment. Correspondents will be held liable for loss resulting from delay in returning papers. Return promptly all unpaid items. Please report by date of letter. Wire nonpayment of items of $1,000.00 and over. Do not protest items $1,000.00 or under, or those bearing this stamp or similar authority of a preceding endorser.' On the above form the Branch Bank typed the words 'Cash draft,' followed by the amount of each of said drafts."

The drawee, Washington Hog Market, is allowed twenty-four hours after presentment of these drafts to it by the Bank of Washington in which to decide whether or not it will accept these drafts. G.S. 25-143.

G.S. 25-96 reads: "Except as herein otherwise provided, when a negotiable instrument has been dishonored by nonacceptance or nonpayment, notice of dishonor must be given to the drawer and to each indorser, and any drawer or indorser to whom such notice is not given is discharged."

G.S. 25-111 reads: "Where the person giving and the person to receive notice reside in different places the notice must be given within the following times: (1) If sent by mail it must be deposited in the post office in time to go by mail the day following the day of dishonor, or if there be no mail at a convenient hour on that day, by the next mail thereafter; (2) if given otherwise than through the post office, then within the time that notice would have been received in due course of mail if it had been deposited in the post office within the time specified in the last subdivision."

The machinery, which is set up by modern banking to facilitate the flow of commercial, negotiable instruments, is geared to these statutes.

Branch Bank by its long delay in notifying the Bank of Halifax of the nonpayment of these drafts lost its right to charge the drafts back to the Bank of Halifax under its agreement, and also lost its right to proceed against its forwarder, the Bank of Halifax, on its endorsement by virtue of the sections of our Negotiable Instruments Act above quoted. Due to its long delay, and at this point, Branch Bank became the owner and holder of these drafts for value.

In my opinion, the evidence and the findings of fact clearly show that Branch Bank is the owner and holder for value of these drafts in the amount of their face value $5,569.26 which it has paid to its forwarder, the Bank of Halifax, and which it realizes it cannot recover from the Bank of Halifax because it breached its duty with the Bank of Halifax to exercise due care, and is entitled to maintain this

action against the Bank of Washington based upon negligence. *American National Bank v. Savannah Trust Company,* 172 N.C. 344, 90 S.E. 302; same case, 177 N.C. 254, 98 S.E. 595; Annotation, 6 A.L.R. 618.

In my opinion, the 3rd conclusion of law of the trial judge: "The Branch Bank has not been damaged by the conduct of the Bank of Washington in attempting to collect the drafts," and his 4th conclusion of law: "The Branch Bank is not the real party in interest and not entitled to maintain this action," are not supported by the findings of fact, and are erroneous and unrealistic. Unless Branch Bank can recover from the Bank of Washington, it will lose $5,569.26, the face value of these drafts.

Plaintiff alleges alternatively: "13. Even if it should be determined that the defendant did not accept said drafts, nevertheless, the defendant negligently failed in its duty as collecting agent to collect said drafts promptly or to return them promptly. The defendant extended credit to the Washington Hog Market, contrary to the plaintiff's instructions, by not requiring the prompt payment of said drafts upon presentment, although it knew or should have known, and is charged with the knowledge that the said Washington Hog Market was then in serious financial difficulties. The acts of the defendant as herein alleged constituted negligence in the performance of its duty to the plaintiff, as a result of which the plaintiff has been damaged in an amount equal to the face amount of said drafts, to wit, the sum of $5,569.26."

Defendant alleged as a further answer and defense a plea of estoppel, as set forth in the majority opinion.

The majority opinion states near its close: "We do not hold the evidence insufficient to support a finding of fact that defendant was negligent."

In my opinion, the facts found by the trial judge show as a matter of law that the defendant was negligent, and that such negligence has proximately caused Branch Bank a loss of $5,569.26, the face value of the drafts. I am further of opinion that the findings of fact show that Branch Bank is not estopped to maintain this action against the Bank of Washington.

The rapid flow of cheques, drafts and other commercial paper is vital to modern business and modern banking. The requirement that payment must be made or notice of dishonor given within the established and allowable time is essential to present day operations of business and of banking. To hold, as the majority opinion seems to hold, that a receiving bank is permitted to charge a cash item back to its customer, who has in all probability, paid such amount to its

depositor, days and weeks after its dishonor, will create utter confusion, and tend to impair, and hamper our credit system and the operations of banking. As appellant aptly says in its brief: "a time honored maxim among bankers warns, 'Never let the sun set on a Cash Item.' "

My vote is to remand the case back to the lower court to reverse the judgment below, and to enter conclusions of law upon the facts found, as set forth above, and then to enter judgment for the plaintiff.

HIGGINS, J., joins in dissenting opinion.